## Gillardi v. Henry et al.

(Decided Feb. 18, 1938.)

CHARLES E. LESTER, JR., and LAWRENCE RIEDINGER, JR., for appellant.

F. V. BENTON, SR., and MALCOM McAVOY for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

This equity action was filed in the Campbell circuit court by the appellees, Charles S. Henry et al., as plaintiffs, against the appellant and one of the defendants below, Walter Gillardi, and his two codefendants, who have not appealed from the judgment rendered by the Campbell circuit court, Sylvester LaFata and his wife, Theresa LaFata. The relief sought by the petition was the recovery of judgment against the two LaFatas, for $11,000 with interest—plus some amounts representing tax payments by plaintiff—and to enforce a second mortgage lien on property located on Monmouth street in the city of Newport, Ky. In addition thereto, plaintiffs sought to set aside as fraudulent and void a deed executed by the LaFatas to their codefendant and appellant, Walter Gillardi, on December 11, 1931, whereby they conveyed to him a house and lot in Fort Thomas, Ky., designated as "Lot Thirty-six (36) of the Henry Heights Subdivision, the plat of which has not yet been recorded, and lying on the west side of Deshler Lane and being more particularly described as follows."

It was alleged by plaintiffs in their petition that the deed to that lot was a voluntary one, without consideration, and void, although it expressed on its face that the consideration therefor was the payment of an alleged indebtedness due from the grantors to the grantee as evi-

denced by three promissory notes ostensibly executed by the LaFatas to the appellant in an aggregate amount of $5,500, the respective dates and amounts of the notes being August 28, 1928, for $1,500 due three years thereafter; November 6, 1929, same amount, due two years thereafter, and June 2, 1931, for $2,500, due on demand. Each of them appears to have been executed in St. Louis, Mo., and signed only by Sylvester LaFata with none of the principal having been paid at the date of the execution of the deed. The petition also averred that the deed was executed with the fraudulent design on the part of the grantors to defraud their creditors, including plaintiffs, and of which design and purpose the vendee therein (appellant Walter Gillardi) had knowledge.

The indebtedness sued on by plaintiffs of $11,000 was the entire deferred purchase price of the *same* lot conveyed by the LaFatas to Gillardi and which conveyance was made by plaintiffs to the LaFatas on December 9, 1931. The consideration was $1,000 due in one year from that date, and the balance of $10,000 due two years from that date, both amounts payable to plaintiffs and each bearing interest payable semiannually. On the next day after the delivery of that deed to the LaFatas, and before it was recorded, Sylvester LaFata departed from his home in Newport, Ky., for St. Louis, where appellant resided, arriving there in the early forenoon of December 10, 1931. A conference of an hour or so resulted in LaFata offering to sell to him the same tract of land—for which he agreed the day before to pay $11,000—in full settlement of the alleged indebtedness due from the LaFatas to appellant of only one-half that amount, i. e. $5,500.

Upon submission of that proposition appellant is alleged to have said, in substance, that he would "meditate over" it. That afternoon LaFata departed on a train for his home, and in the late part of the same afternoon (December 10, 1931) appellant left his home in St. Louis for Newport, Ky., traveling in his automobile and arriving at the latter place near the same time as did Sylvester LaFata, who traveled by rail. Appellant had never seen the property before, but after inspecting it hurriedly he accepted the proposition. On the inspection trip from the home of the LaFatas to the involved property Mrs. Lafata stopped at a ten-cent

store and bought an ordinary pencil tablet. From it some leaves were torn while the parties were inspecting the property, and it is alleged that a rental contract was then and there prepared whereby appellant agreed to rent the property to the LaFatas—he being a nephew of Mrs. Lafata—at the rate of $35 per month, but not to begin until the expiration of nine months from January 15, 1932. That contract was allegedly prepared and executed before appellant ever obtained title to the property.

However, immediately following the inspection trip the parties repaired to the office of an attorney in Newport, who is now dead, and had him to prepare the deed here attacked, which the LaFatas then and there subscribed and acknowledged and the deed was delivered to the attorney to be recorded, all of which was done before the deed made to the LaFatas by plaintiff was recorded, although appellant in giving his testimony stated that he examined that deed in the attorney's office and that he noticed the recording certificate thereon, which, however, under the undisputed evidence had not then been made. Defendant's pleadings denied the grounds of the attack made in the petition, and after extensive proof taken the cause was submitted and the court sustained the prayer of the petition and canceled the deed, to reverse which only appellant appeals—the LaFatas not having done so.

The case presents exclusively one of fact, and we are firmly convinced that the testimony introduced before the trial court portrays as glaring a case of fraud as any record ever filed in this court. There are four volumes of testimony, and it would be a work of supererogation to undertake to state or relate in detail the various contradictions in the testimony of each of the defendants (Gillardi and the two LaFatas), to say nothing about each of them contradicting the other, upon vital and crucial facts relating to the involved transactions. We will, therefore, content ourselves with only mentioning what might be termed the "highest points" in the case for the purpose of demonstrating the correctness of the court's ruling as measured and tested by ancient and mildewed rules for the detection of fraud. Chief among them is the inquiry as to whether or not the attacked transaction occurred in the normal manner universally adopted by mankind in gen-

eral when engaged in similar transactions ror bona fide purposes. To begin with, as we have stated above, the appellant was a nephew of Mrs. LaFata. He was only about 20 years of age when his aunt and uncle are alleged to have obtained the first loan from him, with corresponding increase in his age at the subsequent periods. He was left an orphan when quite young and did not begin work for himself until he was 14 years of age—living the while with his grandmother in St. Louis. At that age he commenced to peddle fruit in the city of his residence to retail merchants, using a truck therefor, and in that occupation (which he had to first build up), according to his testimony, he had saved a considerable sum of money at the time he made his first loan to his uncle and aunt all of which he had in cash in his possession in the home he occupied it being deposited in a hole made in the fireplace to his room, which was done possibly by taking out a brick or so in one of its jams; and which continued to be his "cash" depository throughout the transactions of this case. Each time he would make a loan to his kinsmen he would go to that unnatural depository and obtain from its contents the requisite cash and deliver it to the borrowers, who would transport it in kind to their home in Newport, Ky. At the same time, according to his testimony, he knew that they were in debt to at least some extent, one of their creditors being a brother of appellant. He never appeared to hesitate to make any loan requested of him, and so far as this record shows he made none to any other individual out of his alleged accumulations.

He testified that he built up his business to the point where he was earning from $60 to $70 per week, but strangely enough he at once abandoned and surrendered it and accepted a position in a wholesale fruit store at $30 per week, seven years before the attacked deed was made and four years before he made the first loan to his uncle and aunt. No excuse is offered for that sudden and strange change in occupation, unless he became displeased with the larger amount he was making as a fruit peddler. He does not appear to have made any inquiry as to the purpose for any of the loans he made, except the last one of $2,500, which he understood was to be (at least in part) used in defending an indictment pending in the federal court in Chi-

cago, Ill., against Charles LaFata, his cousin, and a son of his codefendants. However, that alleged loan was made just two days before Charles was tried in the court where he was indicted and at which trial he entered a plea of guilty. The LaFatas contradict themselves all throughout the record as to what they did with the alleged borrowed amounts—their stories concerning which are so fantastic as to render it difficult to unravel, but not so as to conceal a deceptive purpose.

If possible, a more unnatural fact is that the LaFatas solemnly agreed to pay $11,000 for a home and then sold it the next day for one-half that amount without any explanation as to why such almost unheard of character of transaction was entered into, by which they were left with a burdensome debt of $5,500, without any remuneration whatever therefor. Bona fide transactions are not so made, nor is the story told by appellant as to his acquisition of the funds composing the loans to his codefendants—and his depository thereof—in accord with usual and natural methods. None of the related transactions chime with human experience but are always the earmarks of fraud and deception. The chief argument of counsel for appellant is that we should put aside such infallible evidence of fraud and accept in lieu thereof, the contradictory, irreconcilable, and incredible narrative expressly testified to by the defendants.

A few of the many other unnatural transactions testified to by defendants with the reasons given therefor are, that appellant demanded payment of his three notes *contemporaneously* with the acquisition of the title to the involved lot by the LaFatas from plaintiffs because he contemplated immediate marriage and needed the funds; but it will be observed that in settling his debt in the way described he obtained neither cash nor wife, since his wedding did not occur for nearly a year thereafter. Also, when the borrowers from appellant got ready to pay interest on the debt they owed him they did so, not by sending him a check for the amount, but by making an expensive trip to St. Louis where the payment was made in cash. Likewise, the payment of the alleged rental of the involved property from appellant, as hereinbefore referred to, was made in the same manner until after this action was filed, or rumors of its contemplation were circulated, when receipts began to be issued for the rent and some installments began to be

paid with checks. The whole record literally teems with smothering transactions that always accompany fraud, instead of containing open, usual and aboveboard actions, which always indicate and are exclusive companions of fair and bona fide transactions.

We are persuaded that it would serve no useful purpose to continue our comments upon the testimony, much less to undertake a detailed statement of it, and for which reason it will not be undertaken. Appellant insinuated in his testimony that he was ready and willing to reconvey the property to his vendors upon their payment of his indebtedness, with all interest and outlay incurred on account thereof, and he also intimates that there was some such understanding at the time he received his deed. If that be true and if, in fact, his alleged indebtedness is a real one, he would then be entitled to the rights and privileges of a subsequent incumbrancer and to be paid out of any fund remaining from the proceeds of the property after plaintiffs' debt is satisfied, or the remnant thereof after appropriating the Monmouth street property upon which defendants have a mortgage lien as a part security for their debt. Of course, plaintiffs' attack on appellant's deed could not be sustained, howsoever fraudulently the vendors therein may have acted, unless appellant had knowledge thereof at the time he accepted the deed. But the character of testimony we have hereinbefore recited is of a type and nature that leads to the irresistible conclusion, not only that the LaFatas acted fraudulently in making that conveyance, but that their vendee, the appellant, had knowledge thereof and participated therein, even if it should be conceded that his alleged debt against his codefendants was a bona fide one. But the contention that it was or is so, is no more logical or convincing—under the testimony adduced—than it would be to contend that one could run a dairy with only a dry cow, which was the inevitable financially arid condition, under the proof, of the nephew at the time he is alleged to have made the loans to his uncle and aunt.

A brief reference to another contention by defendants should be made. They intimate and rather insist that at the time the involved property was conveyed by plaintiffs to the LaFatas they (plaintiff) agreed to waive any lien on it to secure the payment of the entire deferred purchase price, and that the other collateral

security demanded and given was in lieu of such vendors' lien, which would otherwise exist as between the parties without expressly mentioning it in the deed. Therefore, a purchaser with knowledge of the unexpressed lien in the deed would be subordinated to it. Plaintiffs, of course, deny any such agreement or understanding; but for the purpose of this case, and the maintenance of this action, the rights of the parties are not dependent upon the correct determination of that issue of fact, since if defendant's contention be the correct one, then plaintiffs became a general creditor of the fraudulent vendors and would have the right under the sections of the statute referred to (post) to maintain this action for the relief they prayed for, and which the court gave them.

Much of the brief of appellant is devoted to the urging of the plea of limitations that defendants interposed in their answer, and which counsel say is sustainable under the provisions of section 1911 of Baldwin's 1936 edition of Carroll's Kentucky Statutes. But the six months' limitation therein prescribed is exclusively applicable to an attack upon a *preferential* conveyance, as set forth in the immediately prior section 1910—this action not having been brought within six months after the recording of the attacked deed from the LaFatas to their nephew, the appellant. The instant action is brought under sections 1906, 1907, and 1907a of the same statutes, and which may be maintained at any time within five years after the perpetration of the fraud against which relief is prayed (section 2515 of the same statutes), or within five years from the time of the discovery of the fraud through the exercise of due diligence; but not later than ten years from its perpetration. See section 2519 of the same statutes. The action was brought within ample time as prescribed by the last two sections, and all of the argument with reference to it being barred, as contended in appellant's brief, falls to the ground.

Wherefore, for the reasons stated, the judgment is affirmed.