William Farley BOLLING et al., Appellants,

v.

Sandy ADAMS et al., Appellees.

Court of Appeals of Kentucky.

Dec. 14, 1956.

J. L. Hays, Whitesburg, for appellants.

French Hawk, Whitesburg, Tom Moore, Hazard, for appellees.

MILLIKEN, Chief Justice.

Appellants, William Farley Bolling and Maggie Bolling, his wife, seek reversal of that portion of a judgment of the Letcher Circuit Court adverse to their contention that two deeds executed by the appellees, Sandy Adams and Sarah Jane Adams, his wife, to their son, Owen Adams, should be set aside as having been made for the purpose of defrauding creditors.

In their original complaint filed September 1, 1951, appellants sought to domesticate a judgment of $1,504.50 obtained by them against the appellees on April 30, 1951, in

the Circuit Court of Wise County, Virginia. Later, on July 9, 1952, appellants amended their petition alleging the fraudulent conveyance of realty by appellees to their son and asking that the conveyances be set aside. The entire case was dismissed on April 22, 1954, by the court on its own motion, but later was redocketed and submitted on depositions. The trial court awarded appellants a personal judgment in the sum of the Virginia judgment sued on, but refused to disturb the property conveyances.

The judgment in Virginia against appellees grew out of their default on a lease contract entered into about the 30th of September, 1950, under which they were to operate appellants' restaurant at Pound, Virginia, and pay appellants a monthly rental of $300. On January 10, 1951, appellants filed suit for default on the lease, and judgment was entered in Virginia in their favor on April 30, 1951. Nine days prior to the entry of the Virginia judgment, appellees, who are residents of Letcher County, Kentucky, executed deeds conveying to their son, Owen, all of their interest in two tracts of land located in Letcher County. It is these conveyances which the trial court refused to set aside.

The property conveyed, consisting of two approximately 4-acre tracts, was all the realty owed by appellees. The appraisal value of one of the 4-acre tracts was $750, but the other tract, located at the junction of U. S. Highway 119 and Kentucky Highway No. 15 about two miles east of Whitesburg, is of considerable value. The latter tract was acquired by the appellee Sandy Adams October 7, 1946, and on April 20th of that year he conveyed a one-half interest in the property to his wife, Sarah Jane Adams. On December 20, 1947, Adams and his wife borrowed $20,000 from the Bank of Neon, Letcher County, Kentucky, executing their note therefor, and in order to secure the note executed a mortgage on the road-junction property. On December 31, 1947, and October 11, 1948, Adams and his wife gave the bank their notes for additional loans of $5,000 each with the notes being secured by mortgages on the same tract, so that the total indebtedness on the property at that time was approximately $30,000.

In November, 1949, Adams and his wife conveyed frontage off the property to the Department of Highways for $2,500. Some of this amount was apparently paid on the mortgage, because the bank released its mortgage as to the strip of land conveyed.

On May 2, 1951, another deed was executed by Adams and his wife conveying four tenths of an acre of the highway-junction property to the Standard Oil Company for $12,500. Some $9,900 from this sale was paid directly to the bank on June 18 by the Standard Oil Company, and the bank released its mortgage on the parcel of land conveyed. It will be noted that this latter deed was executed two days after the Virginia judgment was entered and eleven days after the Adamses had conveyed the property to their son, Owen, but the deed to the son apparently exempted the small lot which was to go to Standard Oil, and there is no contest about it. The bank and Henry and Herman Bates, to whom another lot was sold, are parties to this action.

At the time of the conveyances to the son, he was 23 years of age and had been in the Air Force about eight months, having volunteered on August 31, 1950. According to appellees, the son paid them $2,000 cash for the two tracts and agreed to pay off the mortgage on the valuable tract. Their testimony fixes the amount due on the note or notes to the bank at that time at approximately $19,100. They say the $2,000 was paid on the mortgage, reducing it to $17,100, but there is no evidence of this payment other than their oral testimony. No schedule of payments or other evidence of payment appears in the record. The deed to the son recited that the conveyance was made for one dollar and other valuable consideration, but under the terms of the deed the son did not assume

the mortgage, no mention of it even being made in the deed. The parents said they trusted their son and knew he would pay off the mortgage. According to the appellees the bank approved the transfer, but Loren Bentley, cashier of the institution, testified that he did not know of the deed until after it was made, and that he had never heard the board of directors, with whom it was his duty to meet, discuss the matter. The board did approve the deed to Standard Oil, which was approximately contemporary with the deed to the son.

According to the son and his parents, he is a frugal boy. He was graduated from the local high school and attended the University of Kentucky for three years. He worked at Whitesburg and in Michigan for a period before entering the service, and allegedly always saved his money. Also, he made a $50 allotment to his mother which she had saved for him during his eight months of service up to that time. The money for the $2,000 payment allegedly came from these savings. According to the son he was looking for some place to invest his money and was thinking of buying a car, but decided that real estate was a better investment. His parents were thinking about selling out, so he bought their property. He denied knowledge of the suit pending against his parents. The father stated he wanted to sell out and go somewhere and work in order to pay off some of his just debts.

When the deeds to the son were made there was on the junction property a 10-room dwelling house, a restaurant building, and an apartment building with three upstairs apartments which were rented, and the downstairs was leased to the Electric & Machine Supply Company. The son stated that he intended to and did make the payments on the notes out of the income from the property and the proceeds of the allotment to his mother.

The parents continued to reside on the property as before, and the mother still resides there. The father left sometime later in 1951, or in 1952, and took a job in Cleveland where he has worked since. They say they had their son's permission to live on the property until they decided to locate some place permanently. According to the mother, she was to take care of the home and business and try to keep the mortgage paid until her son got back. She stated she collected the rental and paid it on the note, and that she and her husband received no benefit from the money. In fact, she says she and her husband did not even receive a penny from the sale of the lot to the Standard Oil Company, but some $2,600 received from this sale in addition to the $9,900 paid on the mortgage is unaccounted for, because the son stated he did not receive any money from that transaction either. She says she collected the rent and paid on the mortgage each month at first, but later sent the collections to her husband in Cleveland and let him mail in the payments. The income from the space rented to the Electrical Supply Company was $75 per month, later raised to $125. There is no statement as to the total income from the property. The father, who earned $250 per month as the manager of a hotel in Cleveland, testified that he supported himself and wife and had been paying his debts out of his salary. Neither the parents nor the son had a bank account, and there is no written statement of what was and was not paid to the bank. The father refused to file a bank statement, and later said he had disposed of the bank records. He said he supposed his wife endorsed the son's name on the rental checks since "somebody had to." The wife said she had the power to endorse them, but the power wasn't in writing.

There is evidence that the property was assessed in the son's name for taxes subsequent to 1951, and that the taxes were paid. The son was discharged from service in August, 1954, and shortly thereafter went to Cleveland where he is a postal service employee.

On February 11, 1955, the apartment building and .22 of an acre of the junction property was sold to Henry and Herman Bates for $12,000, which amount was paid to the bank and it released its mortgage on the property sold. The parents and the son signed the deed of conveyance to the Bateses because this litigation was then in progress.

It will be seen that the total proceeds from sales of portions of this property was $27,000. Not all of this money was applied on the note, but as of March, 1955, the balance due was only $1,500. The value of the junction property remaining after these sales is estimated by the Letcher County Tax Commissioner at $25,000.

With respect to the events culminating in the conveyance of this property to the son, he testified he was home on leave in November and again in December, 1950, and visited his parents at the restaurant in Pound, Virginia. According to him, his parents at that time were discussing selling the property for $19,100 to pay off the mortgage. He stated he later received a letter from them informing him they couldn't get that much for the property and offering to sell it to him for the $2,000 he had accumulated, and he was to take over the mortgage which would leave $17,100. With respect to how he made the payment, he said:

"Well, I offered to give them $2,000, but at the time I could not give it to them in hand, I was in Texas at that time. And I told them I would pay the $2,000 and in the meantime they took the one dollar and they received the $2,000, which was paid on the mortgage."

Of course, aside from the testimony of the son and the parents, there is absolutely no proof that the son had that much money, or that it was paid on the mortgage.

■ The primary rule in cases of this character is that in order to protect the purchaser three things must occur: (1)

His good faith must appear; (2) a consideration must pass at the time of the purchase; and (3) it must be a fair equivalent of the thing bought. If either of these essentials is wanting, the sale is wanting under the statutes. KRS 378.010 and 378.030; Allen v. Ligon, 175 Ky. 767, 194 S.W. 1050.

The trial court took the view that the burden was on the plaintiffs to prove the fraudulent intent on the part of the parents and to prove that the son had knowledge of that intent, or that the plaintiffs were obligated to prove that no consideration or an inadequate consideration passed at the time of the purchase.

■ It is true that fraud is not to be presumed, but it is also true that it is not required of him who charges it that he should enter into the secret councils of the perpetrators thereof and wrest from them direct evidence of their wrongdoing. Commonwealth v. Filiatreau, 161 Ky. 434, 170 S.W. 1182. The plaintiff may prove such facts and circumstances as will shift the burden of proof to the defendant to show the fairness of the transaction. Coy v. Pursifull, 249 Ky. 57, 60 S.W.2d 93.

■ We have often written that courts look with suspicion upon transactions such as this between persons occupying confidential relations. When such a transaction is exposed to scrutiny, the burden is always upon the recipient of the property acquired to show that the conveyance was fairly made and not tainted with an intent to accomplish a fraudulent purpose. Howard v. First National Bank of Harlan, Ky., 270 Ky. 586, 110 S.W.2d 293; Campbell v. Dixon, 308 Ky. 476, 214 S.W.2d 996; Daniels v. Harp, 300 Ky. 867, 190 S.W.2d 664; Hager v. Coleman, 307 Ky. 74, 208 S.W.2d 518.

■ The conveyances in this instance occurring *inter familia,* at such time and under such circumstances as are here shown, call for more satisfying explanations than the mere testimony of the prin-

cipals, and also call for a greater elaboration of the details of the transactions had between the parents and son than was exhibited in this case. Toomey v. Graber, 300 Ky. 788, 190 S.W.2d 480; Commonwealth v. Filiatreau, 161 Ky. 434, 170 S.W. 1182.

Wherefore the judgment refusing to set aside the deeds as fraudulent conveyances is reversed, and a judgment is directed to be entered setting aside the deeds as fraudulent conveyances and giving the appellants a lien on the property for the amount of their personal judgment, interest and costs.