**In re Keith AKIN, Debtor.**

**James A. HARRIS, Jr.,**
**Trustee, Plaintiff,**

**v.**

**NATIONAL INVESTMENT &**
**FINANCE COMPANY, INC.,**
**et al., Defendants.**

**Bankruptcy No. 5–83–00781.**
**Adv. No. 5–83–0066.**

United States Bankruptcy Court,
W.D. Kentucky.

Aug. 12, 1986.

John T. Reed, Paducah, Ky., for plaintiff.

Mark Whitlow, Paducah, Ky., for Nat. Inv. & Finance Co., Inc.

Donald Muir, Paducah, Ky., for Keith Akin.

Harry W. (Jack) Roberts, Jr., Clinton, Ky., pro se.

Joseph W. Bolin, Murray, Ky., for Bruce's Food Store.

Karen Scent, Paducah, Ky., for Commerce Union Bank.

## MEMORANDUM–OPINION

G. WILLIAM BROWN, Bankruptcy Judge.

This Complaint tests the strong arm powers of the Trustee under 11 U.S.C. 544(b). At issue is whether the threshold test set forth in Section 544(b) has been met and if so, whether the actions and conduct of the defendants are voidable under Kentucky Statutes K.R.S. 378.010 and 378.020.

Section 544(b) provides as follows:

Section 544. Trustee as lien creditor and as successor to certain creditors and purchasers ...

(b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

Kentucky Revised Statutes 378.010 and 378.020 provides:

K.R.S. 378.010—

Every gift, conveyance, assignment or transfer of or charge upon, any estate, real or personal, or right or thing in action, or any rent or profit thereof, made with the intent to delay, hinder or defraud creditors, purchasers or other persons, and every bond or other evidence of debt given, action commenced or judgment suffered, with like intent, shall be void as against such creditors, purchasers or other persons. This section shall not affect the title of a purchaser for a valuable consideration, unless it appears that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

K.R.S. 378.020—

Every gift, conveyance, assignment, transfer or charge made by a debtor, of or upon any of his estate without valuable consideration therefor, shall be void as to all his then existing creditors, but shall not, on that account alone, be void as to creditors whose claims are thereafter contracted, nor as to purchasers from the debtor with notice of the voluntary alienation or charge.

The scenario which forms the factual background for the trustee's Complaint will be briefly summarized. In July, 1973, the debtor/defendant, Akin, terminated a variety of joint business pursuits with defendant, Roberts, which resulted in Akin being sole owner of a number of real estate parcels, a nursing home known as West Kentucky Manor, and all stock ownership in a Kentucky corporation known as National Investment Company (National). In return, Roberts was granted a note and mortgage lien on the nursing home realty in the amount of $100,000.00 plus a note in the amount of $25,000.00 covering the sale of National stock to Akin. This last note was allegedly secured by a pledge of the National stock. Roberts had served for a number of years as attorney and advisor to Akin, and from 1973 through 1978 while Akin exercised complete ownership over these acquired assets, Roberts continued to provide services as Akin's advisor and attorney.

In the Fall of 1978, following a brief but ill-fated grocery venture, Akin negotiated the sale of West Kentucky Manor for the sum of $800,000.00, represented by a note and mortgage on the property in that amount, to a third party who formed a Kentucky corporation known as West Kentucky Manor, Inc. (WKM). This mortgage was a third lien on the property subject to the first mortgage of Liberty Savings Bank and the previously noted second mortgage of Roberts. These prior encumbrances in 1978 totaled $202,000.00 and $151,000.00, respectively. Usual provisions to service the three mortgages were included in the

monthly amortization payments. Akin, as the seller of this nursing home and as sole stockholder of National, directed that National be reflected as payee of the note proceeds and holder of the mortgage lien. This transaction was finalized with the deed and mortgage properly recorded in January, 1979.

Akin also entered into a personal service contract with WKM for an undetermined period at the rate of $100.00 per week plus the use of an automobile, and hospitalization insurance coverage. These payments were in fact made to National during 1979, and from January, 1980 reflected National rather than Akin as the contract party of $150.00 per week.

In the Fall of 1978, Akin, by Agreed Order, settled a support and maintenance claim of his former spouse. While all payments due thereunder were current as of January, 1979, as security for future performance of this obligation, Akin executed a mortgage on certain realty (the IGA property) with his former spouse as mortgagee, in the amount of $198,000.00, of which $158,000.00 represented the remaining future sums due after credit for payments made as of January 1, 1979.

On or about January 1, 1979, Akin began a systematic and exhaustive transfer of his assets from his personal ownership to National, including the following real parcels: Arlington Post Office site, Akin's personal residence, Martin Bank realty (warehouse and six acres), and the IGA and office building site. The sole consideration received by Akin personally for these transfers (including the WKM note) was the assumption by National of the existing encumbrances thereon. All of these deeds and documents evidencing transfer were prepared by Roberts as attorney.

In June, 1979, Roberts demanded payment from Akin of the 1973 note for $25,-000.00 plus accrued interest, a total then owing of approximately $40,000.00. On July 2, 1979, Akin transferred to Roberts all stock ownership in National in complete satisfaction of this obligation. On October 20, 1979, Akin deeded to National realty known as the Shatz Airport tract; in November, 1979, nine realty tracts; and finally in January, 1980, the last two real parcels personally owned by Akin were likewise deeded to National. The only consideration received by Akin was the assumption of existing encumbrances by National, plus cancellation of a $50,000.00 note dated July 20, 1979, allegedly due National from Akin.

Following the stock transfer on July 2, 1979, from Akin to Roberts, Akin continued to serve as President of National until discharged by Roberts in 1982. During this period, Akin enjoyed total discretion to withdraw National funds for his personal usage, which draws were reduced to note obligations on a yearly basis.

In July, 1981, subsequent to the disposal of his assets, Akin personally guaranteed a National note obligation on Parkway Manor Nursing Home. From September, 1981 through March, 1982, Akin personally borrowed from Old & 3rd Bank, a cumulative sum of $360,000.00 and deposited or authorized the deposit of said funds into the Keith Akin Realty Company bank account. Approximately $300,000.00 of said funds were then withdrawn by Akin or National employees and deposited into the account of National. Said funds were substantially used by National to service a loan application from WKM for expansion purposes. WKM then executed a new note and mortgage to National for $1,400,000.00, which amount reflected the original $800,000.00 plus the new advances for expansion purposes. No consideration was received by Akin for these monetary "gifts" to National and derived from the Old & 3rd Bank personal loans. At the time of filing of the debtor's petition for Chapter 7 relief, the debtor, Akin, was still indebted to Old & 3rd Bank for the full amount of this loan.

Finally, the mortgage interest granted Akin's former spouse in the Fall of 1978, was likewise assumed by National in the transfer of January, 1979 of the IGA realty which secured this indebtedness. While the remaining balance due thereon of $158,-000.00 greatly exceeds the prospective

sums due under this Agreed Order (390 weeks × $100 + 90    months × $500.00 = $84,000.00), Akin justifies the additional sum as interest. Further, payments received from WKM on the personal service contract during 1979 were in fact paid directly to the former spouse pursuant to the sums due under the Agreed Order.

The issue presented is whether the Trustee, pursuant to Section 544(b), may avoid these transfers under the authority contained in K.R.S 378.010 and 378.020.

In order to prevail, the Trustee has the threshold burden pursuant to Section 544(b) of establishing the existence of a creditor holding an unsecured claim allowable under Section 502 as of the date of the transfers subject to attack under applicable law. *Universal C.I.T. Credit Corp. v. Bell High Coal Corp.*, Ky., 454 S.W.2d 706, 708 (1970). Upon successfully meeting this threshold test, the Trustee must by clear and convincing proof establish that the transfers in question are voidable under K.R.S. 378.010 and/or 378.020. *Russell County Feed Mill, Inc. v. Kimbler*, Ky., 520 S.W.2d 309, 311 (1975).

The issues were presented at a trial conducted by the court. The record reflects an exhaustive and comprehensive presentation of evidence extending over thirty hours of actual trial time and eighty-eight exhibits filed of record.

The record reflects and the court finds, that in the Fall of 1978, there existed at least two unsecured creditors who meet the requirements mandated by Section 544(b). The "House" claim arose prior to the Fall of 1978 and was due for commissions to Ms. House. While Akin disputed this claim at that time, it nevertheless did exist and was subsequently reduced to judgment in the amount of $8,250.00. Additionally, the Bruce Food Store, Inc. claim for $100,-000.00 and originating from the failed grocery venture likewise existed. While Akin may have envisioned that this obligation would be satisfied through his settlement with Malone & Hyde, Akin was primarily liable on this obligation. The failure of the Malone & Hyde settlement to generate sufficient funds to satisfy the "Bruce" claim does not release Akin from this indebtedness. If the Malone settlement and accounting was improper, Akin's redress was against Malone and in no way impacted on the Bruce claim. Finally, it was acknowledged at the trial in chief that these two claimants existed at the time of filing of this petition for Chapter 7 relief, nor has there been any allegation or proof that these claimants do not have a claim allowable under Section 502 of this title or that is not allowable only under Section 502(e) of this title.

Accordingly, the court specifically finds that the Trustee has, by clear and convincing proof, met the requirements of Section 544(b).

This series of transfers and the interrelation of the entities, Akin, Roberts, and National, will now be examined against the litmus of K.R.S. 378.010 and 378.020.

For purposes of clarity, three distinct intervals will be established and examined. First: those transfers made on or about January, 1979 from Akin, individually, to his then solely owned corporation, National. Second: the transfer of July 2, 1979, wherein all outstanding stock of National was surrendered by Akin to Roberts in full satisfaction of the indebtedness owed by Akin on the 1973 note plus accured interest, a total of $40,000.00. Third: transfers made subsequent to July 2, 1979 by Akin individually to National, whose stock was then solely owned by Roberts.

### TRANSFERS MADE ON OR ABOUT JANUARY 1, 1979

As to the first transactions, the debtor submits that K.R.S 378.020 is not applicable since the transfers from Akin personally to his fully owned corporation were not for a lack of consideration inasmuch as any reduction thereby reflected in his personal financial status would be directly proportionate to the increase in the stock value reflected by these transfers to National. Thus, it is argued, to the extent any equity was transferred to National, an equal and

corresponding increase in his stock values would occur. No evidence was introduced nor does the Trustee seriously dispute this result.

Of more serious inquiry, however, is whether these transfers were violative of K.R.S. 378.010, i.e. whether they were made with the intent to delay, hinder or defraud creditors. The trial established and the court so finds that assets of substantial value and equity were transferred to a corporation solely controlled by Akin; that the uncontroverted testimony of the creditor, House, was to the effect that Akin had unequivocally stated he would take appropriate action to assure that her claim would never be paid; and that at least as to the WKM note and mortgage directly transferred to National, substantial equity of $447,000.00 and monthly payments thereon netting in excess of $3,000.00 were placed beyond Akin's then existing creditors.

Substantial testimony was introduced by all parties as to the equity value, if any, represented by the other real property transfers at that time. The only expert testimony offered was an appraisal conducted by Mr. Sloan. Since this testimony, though offered by counsel for National, was unrebutted and Sloan's qualifications as an expert in this area were expressly acknowledged by all, the court accepts his stated values, as follows: Arlington Post Office—$19,700.00; Akin residence—$39,300.00; Martin Bank tract—$130,000.00; IGA and warehouse site—$298,100.00; for a total value of $487,300.00. The total encumbrances which National assumed pursuant to these transfers are $3,800.00, $25,000.00, $98,000.00 and $280,500.00 respectively, for a total of $407,300.00. It must be noted, however, that these encumbrance values are those most favorable to the defendants since the Anita Akin lien is reflected at $158,000.00 rather than the correct extended amount covering future sums due of $84,000.00. In this respect, the court cautions that findings here established as to the Anita Akin mortgage are determined solely on the basis of testimony given on the question of calculations thereof, and the equity, if any, in the encumbered realty. Since Anita Akin is not a named defendant in this action, no factual determination is made as to the actual amount of her mortgage lien interest nor as to the validity of the transfer of this lien interest.

Akin argues that the monthly debt service on the real property mortgages necessitated the January, 1979 transfers to National due to his limited personal funds and was not for the purpose of hindering, delaying or defrauding his creditors.

The testimony at trial established that the cash flow from these properties in April, 1979 was $15,000.00 per month, while the monthly debt service was $13,000.00. Akin suggests that these transfers of realty to National were reasonable due to the enhanced ability of National to service the monthly mortgage payments thereon. Yet, justification for the transfer of the WKM note of $800,000.00 with net monthly payments thereon of $3,000.00 was to thereby furnish funds for National to pay in part these same monthly mortgage payments and therefore was likewise reasonable. It is difficult, indeed impossible, to reconcile this logic. The court rejects Akin's assertion that these transfers actually helped the debtor's position by relieving him of substantial burdens and further inured to the benefit of the lien creditors by assurance of future payment.

The transfer of substantial assets from individual to corporate ownership did not eliminate the individual liability of Akin on these encumbrances. Here, there was a depletion of assets without consideration other than National's assumption of the continuing lien charges against these properties. *See Pope v. Cawood*, 293 Ky. 389, 168 S.W.2d 985, 988 (1943). There was no assumption of liability by National, merely the continuing in rem liens against the property. Any deficiency on any of these secured properties would continue to be the sole personal liability of Akin.

Where, as here, assets of substantial equity value have been transferred

without consideration, save assumption of existing encumbrances thereon, and where monthly income derived thereon is in excess of that required to service the debt, the Trustee has carried his burden of proof and it is incumbent on the defendant to go forward with rebuttal thereto. *Russell County Feed Mill, supra* at 312; *See also, Bolling v. Adams,* Ky., 296 S.W.2d 696, 699 (1956). Simply stated, the court finds the defendant, Akin, has failed to furnish a sufficient response to the evidence of record.

The court finds that the purpose and effect of the transfer of the real estate parcels and the WKM note and mortgage on or about January 1, 1979 was to place these assets beyond the reach of existing unsecured creditors to their detriment, and that such actions were made with the intent to hinder, delay, or defraud creditors in violation of K.R.S. 378.010.

### THE STOCK TRANSFER OF JULY 2, 1979

As justification for the stock transfer of National to Roberts on July 2, 1979, Akin asserts that Roberts insisted on payment of the 1973 note totaling $40,000.00 then due, and efforts to secure such funds were unproductive. Accordingly, within two weeks of Roberts demand for payment, he transferred the National stock to Roberts in full satisfaction of this debt.

Akin submits the National stock transfer to Roberts was an involuntary transfer. The trial and evidence, however, clearly establishes this was not an involuntary transfer. It is undisputed that Roberts demanded payment in June, 1979 and within two weeks the stock of National was transferred. While Akin avers that several efforts were made to borrow the funds unsuccessfully, no disclosure of those rejecting his loan request was made. Unable to obtain such funds, Akin effectuated the stock transfer. No request for additional time was made nor was request made to refinance or extend the terms of this indebtedness. At no time was suit instituted by Roberts nor was any court action taken to enforce Roberts' alleged secured interest in this "pledged" stock. No evidence was presented to refute that this transfer was other than voluntary.

After hearing thirty hours of testimony, examination of the documentary evidence presented, with opportunity to observe the demeanor of the witnesses, the court finds that the transfer of July 2, 1979 is neither logical, reasonable, credible, prudent, or satisfactorily explained. The value of the corporate stock was far in excess of the Roberts debt. This transfer was totally lacking in adequate consideration and even failed to satisfy Roberts' purported sole desire to "just be paid".

In weighing the evidence presented relative to this transfer, the evidence does not support a finding that this transaction was an "arms length" resolution of a defaulted note. *See Russell County Feed Mill, supra.* It is asserted that Roberts had no confidential relationship with Akin subsequent to 1973 when their business ventures were formally terminated. Yet Akin continued to employ Roberts for many legal matters including preparation of the January, 1979 legal documents of transfer, sought his professional counsel, visited frequently, and maintained a debtor-creditor relationship. Upon demand of Roberts, Akin meekly transferred his National stock, whose asset value had substantially increased due to the January 1, 1979 transfers prepared by Roberts.

In examining the relationship between these parties and the underlying reasons for this transfer, the court is permitted to consider all the evidence which is reflective of their state of mind, both at the time of transfer and subsequently, to the extent it establishes the actual state of mind at the time of transfer.

The relationship between Akin and Roberts extending over many years was at best unique and at worst bizarre. *See Gillardi v. Henry,* 272 Ky. 188, 113 S.W.2d 1158 (1938). The trial testimony neither suggests nor supports a finding that Roberts in any of his dealings with Akin acted in an eleemosynary manner. His testimo-

ny established the nursing home in 1973 to be worthless beyond the then existing mortgages, yet he required Akin to grant a junior mortgage to him for $100,000.00. This interest rate was deliberately set low since Roberts knew Akin must refinance the property in the near future and could do so only upon securing a release from him or an agreement to subordinate his lien at a higher interest rate, all of which subsequently materialized. The cryptic $25,000.00 note of 1973 covering Akin's purchase of National stock achieved its desired goal of "nailing Keith Akin's hide to the wall". The demand for payment by Roberts in June, 1979 would be entirely consistent with his past dealings with Akin. However, Roberts insists that he only sought payment and did not expect delivery of the stock in lieu thereof. This not only lacks credibility but is incredulous in view of his knowledge that the stock value had been greatly enhanced by the January, 1979 transfers.

Their conduct fails in every respect as that of ordinary and reasonably prudent businessmen. *See Gillardi, supra* 113 S.W.2d at 1160. Reasonable efforts were not resorted to by Akin to satisfy the Roberts' debt through the sale of assets, loans, application of National's other assets, or other alternatives. Roberts stated objective of actual payment was likewise not achieved. Their conduct following the transfer further taints their stated intentions. Roberts thereafter exerted no control, direction, or review of the corporation's financial assets or affairs until April, 1982 when Akin's services to National were terminated. Akin conversely remained the President of National, exercising total control over its affairs including absolute discretion in withdrawal of corporate funds for personal usage. Such conduct is entirely uncharacteristic of a creditor who demands payment of a personal note obligation—said demand for payment being the supposed force prompting the stock transfer of July 2, 1979, nor would Akin's retained position with National and withdrawal privileges be consistent with Roberts past history of protecting his interests.

Akin in fact needed to look no further than National's assets to satisfy Roberts debt. Roberts' unrebutted testimony established that National owned approximately $70,000.00 of bank stock which was sold and used in part for the improvement loan extended WKM after July 2, 1979. He further testified he had not purchased this bank stock, but rather Akin had acquired it in an attempt to gain control of the bank, an effort he opposed. Akin stated this stock was acquired in 1980, yet it appears as an asset of National on the financial statement of December, 1979. In view of Roberts' stated opposition to the acquisition thereof, it was unlikely to have been purchased after July 2, 1979, since Akin could not have gained control of the bank when the bank stock was owned by National in which he no longer had an interest. Its sale in July, 1979 could have afforded a method of liquidating the Roberts' debt.

The testimony disclosed that from July 2, 1979 through January, 1982, Akin either expressly or impliedly continued to hold himself out as the sole stockholder of National. Indeed this "rumor" formed the basis of his dismissal by Roberts in April, 1982.

In summary, the court finds the stock transfer of July 2, 1979 in satisfaction of Roberts' debt to be a sham, totally lacking in adequate consideration, and designed to transfer the legal ownership of Akin's stock beyond the reach of his creditors for the purpose of hindering, delaying or defrauding their claims. This conduct was entirely consistent with their dealings prior to 1973, when Roberts testified it mattered not who was the record owner of their assets since each knew in fact who the true owner was as between them.

Based on the above Findings of Fact and Conclusions of Law, the transfer of National stock from Akin to Roberts on July 2, 1979, was to hinder, delay or defraud existing creditors, and further was made for less than a valuable consideration in violation of K.R.S. 378.010 and 378.020, and accordingly, is void.

## TRANSFERS BY AKIN TO NATIONAL SUBSEQUENT TO JULY 2, 1979

Subsequent to July 2, 1979, when Roberts' debt was purportedly satisfied, Akin continued the transfer of his remaining real property to National for the sole consideration of National's assumption of the existing encumbrances thereon. As with the previous transfers, these transfers imposed no actual liability on National but merely retained the in rem liens then existing. The personal liability of Akin remained notwithstanding these transfers to National. While the testimony of Sloan and Akin as to values and encumbrances on these tracts is in conflict, the court is of the opinion and does so find that the totality of these transfers resulted in a marginal equity benefit to National, when the inflated Anita Akin lien and the unexplained National lien resulting from the July 20, 1979 Keith Akin 'loan' are deducted from the encumbrances assumed.

In considering Akin's financial situation on or about July 2, 1979, his CPA, Harris, testified that Akin was actually owed an amount in excess of the Roberts' debt from National. Yet, on July 20, 1979, Akin granted to National a secured interest on real property he then owned. No effort was made to explain why Akin ostensibly borrowed a sum from National almost identical to that then due him from National.

With the final realty transfers in January, 1980, Akin had totally divested himself of real property assets, all to the benefit of National. There then ensued a transaction of unparalleled generosity. From September 1, 1981 through March, 1982, Akin personally borrowed a cumulative sum of $360,000.00 from Old & 3rd Bank and deposited approximately $300,000.00 thereof into the National account. In explanation of these 'gifted' sums to National and used in part to fund the WKM expansion, Akin suggests this personal loan was collateralized by a Contract to Sell of a National asset acquired from Akin. The fallacy of this explanation is that the sale was never consummated, hence the sale proceeds predictably were never remitted to the lender, who remains a creditor in this bankruptcy proceeding. If National did intend to collateralize this personal loan, a simple expedient would have been to grant to the lender a mortgage lien on the property payable on closing of the hoped-for-sale. This transaction is illustrative of the intertwined dealings between Akin and National after the transfer of his stock interest in National on July 2, 1979 and during the ensuing period under Akin's retained control and Presidency of National—a period in which to some parties he continued to represent his continued ownership of National. His representations were so convincing as to prompt Roberts to remove Akin as President in April, 1982, based on these persistent 'rumors'.

Additionally, when this sale did not materialize, it is significant that National did not recognize Akin's interest in the WKM note and mortgage to National derived in large part by National's use of Akin's personally borrowed and 'gifted' funds.

■ The court hereby finds the transfer of Akin assets, real or personal, subsequent to July 2, 1979, to be without adequate consideration, and further were made to hinder, delay, or defraud then existing creditors. All of these transfers were made to National, then purportedly owned by Roberts. The court further finds that said transfers were violative of K.R.S. 378.010 and 378.020 and as such are voidable.

None of these transfers suggest an 'arm length' transaction, but rather a deliberate and concerted scheme to place virtually all of Akin's assets beyond the control of existing creditors.

Akin and Roberts, for all their acquired business acumen as investors, realtor and attorney, display a remarkable belief in the naiveness of this Court. Seldom has there been demonstrated a litany of more blatant and arrogant flaunting of creditors' rights as presented by this series of self dealings, transfers without adequate consideration, transfers for no consideration, unexplained loans, gifts of significant funds, or inflated

liens to secure future obligations. *See Gillardi, supra.*

Nor can Roberts claim with dignity, credibility, or merit a lack of knowledge as to these transactions. For many years, Roberts served as attorney, advisor, and one-time joint venturer with Akin. Having prepared the transfer documents on January, 1979, he was well aware of the enhanced value of National resulting therefrom. His demand of Akin for payment and the subsequent stock transfer on July 2, 1979 clothed him with legal title to National's stock, yet he supposedly exercised no review of its financial condition then or until April, 1982. Allowing Akin to remain as President with total control over National's assets is inconsistent with his stated goal of being paid only the $40,000.00 due in July, 1979. Roberts' ignorance, if such it was, of the significance of the transfers before and after July 2, 1979, was self-imposed. Never did he question the transfers subsequent to July 2, 1979 which documents he likewise prepared, nor the deposit of over $300,000.00 of Akin's personally borrowed funds into the account of National.

National, as the conduit and recipient of these transfers, was merely the convenient corporate vehicle through which Akin isolated these assets, first while still owned by him, and later by Roberts, his attorney, advisor, and scrivener of these transfer documents. In commenting on their relationship, Roberts testified that during their joint venture days in 1973—

"... we had an understanding that whichever one was the most convenient had the title. For example, if I had brought a suit to sell a tract of land at the courthouse door, I wouldn't bid on it. He would bid on it, and I would sign a bond. So, he'd take title to the property. And if I had a client who wanted to sell me the farm, he'd look to me for this—then I took the title. But I knew Keith owned half of it, and he knew I owned half of his." (T of E, Vol. III, p. 15)

The testimony presented during trial convinces this Court that the conduct of Akin and Roberts evidences little change in the intervening years and the transfer of National stock to Roberts on July 2, 1979 is, in fact, 1973 revisited.

Taken as a whole, this entire series of transfers commencing on or about January 1, 1979 and continuing through April, 1982, evidence conduct of such specific and general fraud as to be transparent to even the casual observer. *See Gillardi, supra.* This reprehensible conduct evidences a program of diligent, exhaustive, and concerted effort to grant liens where none are due, a series of transfers in piecemeal fashion of every asset in one's estate without adequate consideration, personally guarantying corporate liabilities without explanation, and the outrageous 'gift' of $300,000.00 to National. These transfers, now exposed, clearly depict a preconceived and cavalier disregard for creditors' rights totally lacking of any redeeming quality. As stated succinctly in *Gillardi v. Henry, supra* at 1161:

The whole record literally teems with smothering transactions that always accompany fraud, instead of containing open, usual and aboveboard actions which always indicate and are exclusive companions of fair and bona fide transactions.

In summary, the court finds the transfers of realty and the WKM note and mortgage on or about January 1, 1979 to be in violation of K.R.S 378.010 and void; the stock transfer of National from Akin to Roberts on July 2, 1979 to be in violation of K.R.S. 378.010 and 378.020 and void; the transfers of realty and 'gifts' subsequent to July 2, 1979 to be in violation of K.R.S. 378.010 and 378.020 and void.

The above constitutes Findings of Fact and Conclusions of Law pursuant to Rules of Bankruptcy Procedure 7052. A separate Order consistent herewith will be entered this date.