Gary R. RECORD, Respondent,

v.

METROPOLITAN TRANSIT COMMISSION, Appellant.

No. 49273.

Supreme Court of Minnesota.

Oct. 5, 1979.

1. See, *Mansfield v. Gopher Aviation Co.,* 301 Minn. 36, 221 N.E.2d 135 (1974).

O'Connor & Hannan and Kenneth B. Jones, Jr., Minneapolis, Charles Hvass, Jr., Minneapolis, for Minnesota Trial Lawyers Ass'n, appellant.

LeVander, Zimpfer & Zotaley and Byron L. Zotaley, Minneapolis, for respondent.

PETERSON, Justice.

This action was commenced by plaintiff, Gary R. Record, against his employer, Metropolitan Transit Commission (hereafter MTC), and a fellow employee, James Bernard LeTourneau,[1] seeking damages in tort for negligence and claiming additional disability and income loss benefits pursuant to the Minnesota No-Fault Automobile Insurance Act (hereafter no-fault act). Plaintiff was involved in a motor vehicle accident on November 18, 1976, when the MTC bus he was driving collided with another MTC bus

---

1. James Bernard LeTourneau is not a party to this appeal.

driven by LeTourneau. Plaintiff has remained continuously totally disabled since the date of the accident. The two primary issues in this case involve the proper method to be used in determining the amount of weekly no-fault income loss benefits plaintiff is entitled to receive, since he is also receiving workers' compensation income loss payments, and whether workers' compensation retraining benefits are to be subtracted in computing the weekly no-fault income loss benefits payable to plaintiff. Both of these issues present questions of statutory interpretation. A third issue involves assessment of the statutory interest provision of § 65B.54, subd. 2. MTC is a self-insured employer under the workers' compensation act and a self-insured reparation obligor under the no-fault act.

Based upon a factual stipulation between the parties, plaintiff sought a declaratory judgment requiring MTC to pay additional weekly no-fault disability benefits plus interest. The trial court, by its order granting partial summary judgment, awarded plaintiff additional weekly no-fault disability and income loss benefits plus interest but allowed MTC to subtract plaintiff's workers' compensation retraining benefits when it computed the no-fault income loss benefits it owed to plaintiff. Both MTC and plaintiff appeal from the partial summary judgment.[2] We affirm.

1. MTC's appeal involves the interaction between no-fault act provisions, § 65B.44, subd. 3, and § 65B.61, subds. 1 and 2. Section 65B.44, subd. 3, provides, in pertinent part:

"Disability and income loss benefits shall reimburse 85 percent of the injured person's loss of present and future gross income from inability to work proximately caused by the nonfatal injury subject to a maximum of $200 per week."

Section 65B.61, subd. 1, provides:

"Basic economic loss benefits shall be primary with respect to benefits, except for those paid or payable under a workers' compensation law, which any person receives or is entitled to receive from any other source as a result of injury arising out of the maintenance or use of a motor vehicle."

Section 65B.61, subd. 2, provides:

"Benefits paid or payable under a workers' compensation law because of the injury or death shall be subtracted in computing basic economic loss benefits, but only to the extent that they exceed any deductible applicable to the basic economic loss benefits."

The gravamen of MTC's appeal in this case is whether § 65B.61, subd. 2, requires that plaintiff's workers' compensation benefits be subtracted from the $200 weekly maximum[3] or whether it requires that his workers' compensation benefits be subtracted from his gross weekly income of $281.20.[4]

MTC contends that any uncertainty raised by these statutory provisions is resolved by § 65B.54, subd. 3, which states:

---

**2.** Only the matters raised by plaintiff's motion for declaratory judgment are at issue in this appeal.

**3.** MTC has always taken the position that plaintiff's workers' compensation benefits should be subtracted from the $200 weekly maximum. Therefore, because MTC paid plaintiff $145.33 per week pursuant to provisions of the workers' compensation act for continuous total disability from the date of the accident through September 30, 1977, it paid during the same period of time $54.66 to plaintiff pursuant to provisions of the no-fault act. Similarly, MTC paid plaintiff $154.05 per week from October 1, 1977, through January 3, 1978, pursuant to provisions of the workers' compensation act, the increase due to the inflationary increase adjustment provision of Minn.St. 176.-

645, and paid plaintiff $45.95 pursuant to provisions of the no-fault act. MTC did not make no-fault income loss benefit payments after January 3, 1978, because on that date plaintiff commenced his retraining program and thus became entitled to retraining benefits under the workers' compensation act. See, § 176.101, subd. 7. The relation between no-fault income loss benefits and workers' compensation retraining benefits is discussed later in this opinion.

**4.** The parties stipulated that plaintiff's average weekly wage rate on the date of the accident was $281.20 per week, and this is the basis upon which income loss benefits for total disability under both the workers' compensation act and the no-fault act is to be computed.

"A claim for basic economic loss benefits shall be paid without deduction for the benefits which are to be subtracted pursuant to section 65B.61, if these benefits have not been paid to the claimant before the reparation benefits are overdue or the claim is paid. The obligor is entitled to reimbursement from the person obligated to make the payments or from the claimant who actually receives the payments." MTC argues that since a no-fault reparation obligor is never obligated to pay more than $200 per week in no-fault income benefits, even if the workers' compensation insurer does not pay, workers' compensation benefits are to be subtracted from the $200 maximum weekly amount.

■ We are not persuaded by MTC's argument. The wording of § 65B.54, subd. 3, does not mandate such an interpretation. What is more, MTC's position is contrary to the policy behind this section. The clear purpose of the section is to provide prompt payment of economic benefits to an insured. Because many provisions of the no-fault act are based upon provisions of the Uniform Motor Vehicle Accident Reparations Act (hereafter UMVARA), 13 U.L.A. at 357 to 441, such UMVARA provisions may be considered in ascertaining the legislative purpose behind related sections of the no-fault act. There is a great deal of similarity between § 23 of UMVARA and Minn.St. 65B.54; § 23(c) of UMVARA is virtually identical to subd. 3 of Minn.St. 65B.54. The commissioners' comments to § 23 of UMVARA demonstrate that the section is intended to provide prompt payment of benefits. 13 U.L.A. at 404. Similarly, the purposes to be effected by the no-fault act are stated in § 65B.42, in part, as follows:

"(1) To relieve the severe economic distress of uncompensated victims of automobile accidents within this state by requiring   *   *   *   prompt payment of

specified basic economic loss benefits * * *.

*   *   *   *   *   *

"(3) To encourage appropriate medical and rehabilitation treatment of the automobile accident victim by assuring prompt payment for such treatment." Section 65B.54, subd. 3, relates to all benefits described in § 65B.44,[5] and these benefits include medical expense and income loss. Many of the same benefits are provided under the workers' compensation act, but such benefits are often contested. The clear purpose of § 65B.54, subd. 3, is to require a no-fault reparation obligor to pay benefits such as medical expense and income loss before they become overdue, regardless of what might be the ultimate outcome of the workers' compensation claim.[6] Section 65B.54, subd. 3, therefore, lends no support to MTC's position.

■ MTC has therefore failed to cite a no-fault provision which dilutes or limits the benefits to a combined $200 per week for no-fault income loss benefits and workers' compensation temporary total disability benefits. The logical meaning to be drawn from § 65B.44, subd. 3, and § 65B.61, subds. 1 and 2, is that workers' compensation disability payments are to be subtracted from an insured's gross weekly wage rate.

Important support for this position is found in UMVARA. The effect of § 65B.61 is similar to the net loss calculation provided for by § 11(a) of UMVARA. The latter section provides that benefits received from workers' compensation are subtracted in calculating a person's "net loss," the amount for which he is reimbursed under UMVARA. See, UMVARA § 1(a)(2). The effect of § 11(a) is to make workers' compensation benefits primary under UMVARA. Section 13 of UMVARA further provides a $200 limit on weekly benefits payable for work loss.[7] The interrelation-

---

**5.** Section 65B.43, subd. 10, states: " 'Basic economic loss benefits' means benefits as described in section 65B.44."

**6.** Under § 65B.54, subd. 3, if the workers' compensation act insurer is eventually found to be

liable, the no-fault reparation obligor is entitled to reimbursement from the workers' compensation act insurer.

**7.** Section 11(b) of the Uniform Motor Vehicle Accident Reparations Act requires a reduction

ship between this provision and § 11 is discussed in the commissioners' comments to § 13, which state:

"Significantly, the $200 limit provided by this Section is a limit on benefits to be paid and not a limit on 'loss' or 'net loss' which go into the calculation of basic reparation benefits." 13 U.L.A. at 388.

We therefore affirm the trial court on this issue and hold that plaintiff's workers' compensation disability benefits should be subtracted from plaintiff's gross weekly wage and not from the $200-per-week figure.

2. Plaintiff's appeal challenges the correctness of the trial court's decision that MTC is entitled to subtract workers' compensation retraining benefits paid or payable to plaintiff under § 176.101, subd. 7, when it computes the amount of no-fault income loss benefits it must pay to plaintiff pursuant to § 65B.44. Plaintiff, on January 3, 1978, commenced a 2-year certified course of retraining. Under § 176.101, subd. 7, plaintiff is entitled to receive additional compensation from MTC during the actual period of retraining, compensation equal to the amount plaintiff receives under the workers' compensation act for temporary total disability.[8] As required, MTC has provided the additional workers' compensation retraining benefits.[9] However, because of the amount of workers' compensation retraining benefits it now pays, MTC has refused, since January 3, 1978, to pay plaintiff further no-fault income loss benefits.

The question is whether subds. 1 and 2 of § 65B.61 indicate that the legislature intended workers' compensation retraining benefits to be subtracted in computing the amount of income loss benefits to be paid under the no-fault act. Section 65B.61 does not delineate which workers' compensation benefits are primary and are to be subtracted in calculating no-fault basic economic loss benefits. The section speaks merely of benefits "paid or payable under a workers' compensation law."

■ However, differentiation must be made between the benefits provided by the no-fault act and the benefits provided by the workers' compensation act. To the extent that both the no-fault and workers' compensation acts provide for compensation for personal injuries arising from motor vehicle accidents, the statutes are in *pari materia*. The presumption thereby arises that the same general legislative policy underlies these two statutes and that together they constitute a harmonious and uniform system of law.

For example, both the no-fault act and the workers' compensation act provide medical expense benefits and disability or income loss benefits. Under the no-fault act, medical expense benefits are subject to a statutory maximum of $20,000,[10] whereas income loss benefits have a statutory ceiling of $10,000 plus a weekly limitation of 85 percent of a person's weekly income loss up to $200.[11] Because these statutes should be viewed as constituting a uniform and harmonious system, workers' compensation medical benefits should be considered primary under § 65B.61, subd. 1, in relation to no-fault medical expense benefits, and

---

in net loss for the amount attributable to income tax savings to a maximum of 15 percent. This same result is incorporated into the no-fault act (§ 65B.44, subd. 3), via the 85-percent ceiling on income loss benefits.

8. By reason of a stipulated settlement between plaintiff and MTC, it was agreed plaintiff would receive workers' compensation retraining benefits as long as he satisfactorily pursued the course of study recommended by the Department of Vocational Rehabilitation, subject to a maximum of 104 weeks.

9. From October 1, 1977, through September 30, 1978, MTC paid plaintiff $154.05 per week in temporary total disability benefits and $154.05

per week in additional retraining benefits. Effective October 1, 1978, through the present time, MTC pays $163.29 per week in temporary total disability benefits and $163.29 per week in additional retraining benefits. MTC is presently paying the higher figure because of the inflationary adjustment provision of § 176.645, which required a 6-percent increase in benefits effective October 1, 1978.

10. Section 65B.44, subd. 1(a).

11. Section 65B.44, subds. 1(b) and 3.

workers' compensation disability benefits should be considered primary in relation to no-fault income loss benefits.

■ The present problem is how to characterize, absent an unambiguous statement by the legislature, workers' compensation retraining benefits paid under § 176.101, subd. 7. Workers' compensation retraining benefits are not limited to reimbursement for the expenses incurred in obtaining vocational rehabilitation; rather, they are a duplication of temporary total disability payments and are thereby calculated according to a person's weekly wage. See, § 176.101, subds. 1 and 7. We therefore agree with the trial court that workers' compensation retraining benefits are more closely related to no-fault income loss benefits than to other no-fault benefits.

Allowing MTC to subtract plaintiff's workers' compensation retraining benefits more suitably fulfills the intent of the legislature to have the workers' compensation act and the no-fault act interact to create a uniform and harmonious system of compensation. The total amount of weekly compensation benefits plaintiff would receive if workers' compensation retraining benefits were not subtracted would be substantially in excess of the amount he earned while working for MTC, a result probably not intended by the legislature. Plaintiff is now receiving $163.29 in weekly workers' compensation retraining benefits. He is therefore receiving $326.58 weekly in nontaxable income in workers' compensation benefits. His average weekly wage on the date of his accident, the basis upon which his no-fault and workers' compensation income loss benefits for total disability was computed, was $281.20, and such wages constituted taxable income. If plaintiff was still working for MTC, his average weekly wage would be $336.48. If workers' compensation retraining benefits are not sub-

tracted, plaintiff would receive another $100.22 in weekly no-fault income loss benefits under § 65B.44, subd. 3, bringing his weekly total of nontaxable income to $426.80. Such an amount is grossly in excess of plaintiff's average weekly wage rate and has little relation to the compensation he earned before the accident. We do not believe the legislature intended the two statutes to interact to create such a disproportionate amount of compensation benefits. We therefore hold that workers' compensation retraining benefits paid or payable under § 176.101, subd. 7, should be subtracted when computing no-fault income loss benefits payable under § 65B.44.[12]

■ 3. Under § 65B.54, subd. 1, no-fault basic economic loss benefits, including income loss benefits, are payable monthly and are overdue if not paid within 30 days after the reparation obligor receives reasonable proof of the fact and of the amount of loss realized. Section 65B.54, subd. 2, provides that overdue payments shall bear simple interest at the rate of 10 percent per annum.[13] Because of our holding that plaintiff's workers' compensation disability benefits should be subtracted under Minn.St. 65B.61, subd. 2, from plaintiff's gross weekly wage and not from the $200-per-week figure, MTC has not paid the full amount of no-fault income loss benefits due plaintiff. The final issue in this case is whether such underpayments should be considered overdue payments under § 65B.54, subd. 1, thereby invoking the 10-percent-per-annum interest provision of § 65B.54, subd. 2.

There is little question that MTC received reasonable proof from plaintiff of the fact and amount of loss realized. Plaintiff and MTC have disagreed upon the method to be used in determining the amount of no-fault income loss benefits to be paid when an injured person also receives workers' compensation disability benefits. The parties

---

**12.** Plaintiff contends subtraction of workers' compensation retraining benefits would destroy the economic incentive the legislature provided in § 176.101, subd. 7, for vocational rehabilitation. We do not think our holding in this case will have such an effect, but if we have misin-

terpreted the legislature's intent, the legislature can make clear its contrary intent.

**13.** Effective July 1, 1979, overdue no-fault economic loss benefit payments bear simple interest at the rate of 15 percent per annum. See, L.1979, c. 190, §§ 3 and 9.

therefore differed in how they believed the no-fault act would be interpreted by this court. The gravamen of the issue is whether we should make prospective our holding that workers' compensation disability benefits should be subtracted under § 65B.61, subd. 2, from an injured person's gross weekly wage.

MTC's basic argument is that it believed it was complying, in good faith, with the provisions of § 65B.44, subd. 3, and that it therefore could not know the amounts of no-fault income loss benefits which were overdue. MTC also argues that many municipalities and common carriers are obligated to pay under both the no-fault act and the workers' compensation act and that if this court's holding is not made on a prospective basis, they too will incur heavy financial and administrative burdens.[14]

We are not persuaded by MTC's position. The present case does not involve a situation where this court will overturn a common-law rule or change a longstanding interpretation of a statute.[15] In deciding the amount of no-fault income loss benefits owed to plaintiff, MTC did not rely upon any decision of this court. MTC simply relied upon how it believed the no-fault act would be interpreted. Since the inception of the no-fault act, MTC could have prepared for the liabilities exemplified in this case either by setting its insurance reserves or by seeking a declaratory judgment.

We see no need, in this case, for a prospective ruling; and, therefore, we agree with the trial court that MTC is required to pay plaintiff interest of 10 percent per annum on overdue no-fault income loss benefits.

Affirmed.

TODD, J., took no part in the consideration or decision of this case.

14. However, MTC is unable to estimate such costs.

15. For example, in its decisions involving municipal and government tort liability, this court

has made its ratings prospective. See, *Nieting v. Blondell*, 306 Minn. 122, 235 N.W.2d 597 (1975); *Spanel v. Mounds View School Dist. No. 261*, 264 Minn. 279, 118 N.W.2d 795 (1962).