552 N.W.2d 226 (1996)
In re Gerald N. BUTLER, Debtor.
Molly T. SHIELDS, Trustee for the Estate of Gerald N. Butler, Plaintiff,
v.
Norman GOLDETSKY and Percy Greenberg, Defendants.
No. C2-96-130.
Supreme Court of Minnesota.
August 8, 1996.
*228 Johnson & Madigan, P.L.L.P., David S. Johnson, Thomas P. Harlan, Minneapolis, for appellants.
Doherty, Rumble & Butler, Marc J. Manderscheid, Steven Weintraut, St. Paul, for respondents.
Heard, considered and decided by the court en banc.

OPINION
ANDERSON, Justice.
The United States Bankruptcy Court for the District of Minnesota has certified to this court the following question of law: Does the Minnesota Fraudulent Transfer Act, Minn. Stat. §§ 513.41-.51 (1994), apply to regularly conducted, noncollusive statutory cancellations of contracts for deed pursuant to Minn. Stat. § 559.21 (1994)? We answer the question in the negative.
The facts underlying the action that generated this certified question are undisputed. Appellants, Norman Goldetsky and Percy Greenberg, are the owners and contract for deed vendors of the Crown Iron Works Building in Minneapolis, Minnesota (Property). On August 30, 1985, Crown Partners III, a Minnesota general partnership, entered into a contract for deed with the vendors to purchase the Property. Gerald N. Butler, the Debtor, was a general partner of Crown Partners III, which was specifically formed to purchase and own the Property. The purchase price was $1,275,000, of which $151,500 was to be paid in cash at the time of closing, and the $1,123,500 balance to be paid pursuant to the terms of the contract for deed. The contract provided for monthly payments of $10,809 beginning on October 1, 1985, and continuing until no later than June 30, 1991, when a balloon payment of $650,000 was due. After the $650,000 balloon payment, the monthly payments were to be $4,500 until June 30, 1994, when a second balloon payment of $250,000 was due. After the $250,000 balloon payment, the required monthly payment was $3,500 until all principal and interest was paid in full. The contract also required Crown Partners III to pay real estate taxes when due, to insure the Property, and to keep it in good condition and repair. Vendors were to make all payments on an underlying mortgage on the Property.
Between August 30, 1985 and May 23, 1989, Crown Partners III defaulted on the contract for deed numerous times by failing to adhere to its terms. The vendors began proceedings to cancel the contract on several occasions, but Crown Partners III forestalled the cancellation by curing the defaults, and each time the contract was reinstated. In 1989, as part of an agreement to reinstate the contract for deed, Butler gave a personal guaranty for payments and other obligations in default in any subsequent cancellation. In 1990, the vendors commenced an action in state district court seeking appointment of a receiver to manage the Property. A receiver was appointed on May 31, 1990 to manage, collect rents and pay bills for the Property. The final default by Crown Partners III resulted in the May 13, 1991 cancellation of the contract for deed. The vendors served the notice of cancellation on all interested parties. The first notice was served on March 13, 1991, and notice was served on Butler on *229 March 14, 1991. At the time of the cancellation of the contract for deed, Crown Partners III still held the vendee's interest in the contract. The balance due under the contract was approximately $1,123,000. In Butler's opinion, the fair market value of the property was as high as approximately $2,200,000, although this figure is disputed by the vendors. The parties agree that the cancellation of the contract for deed met all statutory requirements.
In 1992, the vendors sued Butler on his guaranty and obtained a default judgment against him in the amount of $192,836.68 for "waste" of the property and other liabilities incurred prior to cancellation. Butler, now the sole partner of Crown Partners III, filed for bankruptcy protection on September 3, 1993. On August 25, 1995, the bankruptcy trustee, Molly T. Shields, filed an adversary proceeding seeking to avoid the cancellation of the contract for deed and to recover the amount of the "fraudulent transfer," or approximately $1,200,000.
The vendors moved to dismiss the trustee's complaint for failure to state a claim on which relief could be granted, alleging three grounds: (1) that the trustee lacked standing because the cancellation action was against Crown Partners III and not against Butler, the Debtor; (2) that the trustee failed to allege with sufficient particularity the facts regarding the value of the Property and Butler's financial condition; and (3) that a regularly conducted, noncollusive statutory cancellation of a contract for deed cannot, as a matter of law, constitute a fraudulent transfer under Minnesota's Fraudulent Transfer Act. In response, the trustee contended that Minnesota's Fraudulent Transfer Act does apply to this cancellation of the contract for deed because Butler did not receive reasonably equivalent value for the transfer. The bankruptcy judge ruled that the trustee has standing to sue, that the complaint was pleaded with sufficient particularity, and ordered that the question whether Minnesota's Fraudulent Transfer Act applies to regularly conducted, noncollusive statutory cancellation of contracts for deed be certified to the Minnesota Supreme Court, pursuant to Minn.Stat. § 480.061 (1994).

I.
A certified question is a matter of law and this court is free to independently review it on appeal. Foley v. Honeywell, 488 N.W.2d 268, 270 (Minn.1992). Answering this certified question involves the interpretation of two Minnesota statutes, the statute governing contracts for deed and their cancellation, Minn.Stat. § 559.21, and the Fraudulent Transfer Act, Minn.Stat. §§ 513.41-.51. A discussion of the background of the law in Minnesota relating to contracts for deed and to the Fraudulent Transfer Act is necessary to our analysis of the certified question.

A. Contracts for Deed
A contract for deed is a financing arrangement which allows a buyer  the vendee  to purchase property by borrowing the money for the purchase from the seller  the vendor. It is essentially a financing arrangement for a real estate sale in which the vendee has all the incidents of ownership except legal title. In re Adolphsen, 38 B.R. 776, 778 (Bankr.D.Minn.1983), affd, 38 B.R. 780 (D.Minn.1983). The vendee has equitable title, and the vendor retains the legal title as security for the purchase price. Petition of S.R.A., Inc., 219 Minn. 493, 507, 18 N.W.2d 442, 450 (1945), aff'd, S.R.A., Inc. v. Minnesota, 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851 (1946); Nolan v. Greeley, 150 Minn. 441, 442, 185 N.W. 647, 648 (1921); Shraiberg v. Hanson, 138 Minn. 80, 82, 163 N.W. 1032, 1033 (1917).
The vendor in a contract for deed retains a vendor's lien on the property. A vendor's lien is an implied equitable lien upon real property for the amount of the unpaid purchase price. It exists independently of any express agreement at the time of the conveyance and without regard to the absence of the grantor's intention to claim it. The basis for the vendor's lien is the broad equitable principle that a person having obtained the estate of another should not be allowed to keep it without paying the purchase price. Grace Dev. Co. v. Houston, 306 Minn. 334, 335-36, 237 N.W.2d 73, 75 (1975). "[A] vendor's security interest, like the interest of a purchase money mortgagee, protects *230 the vendor's or owner's property rights from being appropriated by creditors of a vendee * * *. * * * [t]he vendor's security interest or lien provides the critical security to a seller that is essential for an installment land sale contract to be a commercially reasonable way of selling real estate." Butler v. Wilkinson, 740 P.2d 1244, 1256 (Utah 1987).
Contracts for deed provide a useful alternative financing mechanism which promotes the availability of credit and the transferability of property, and the legislature has approved contracts for deed as being in Minnesota's best interest by enacting legislation which supports their continued use. See Minn.Stat. §§ 559.205-.216 (1994). In Minnesota, one remedy available to a vendor upon the vendee's defaulting under the terms of the contract for deed is the vendor's ability to cancel the contract pursuant to Minnesota Statutes section 559.21. A statutory cancellation of a contract for deed results in the vendee's forfeiture of all payments made and restoration of full legal and equitable title in the property to the vendor. This result is different from that in a mortgage foreclosure sale, where the defaulting party may receive proceeds of a mortgage foreclosure sale above the amount owed on the property.
The potentially severe consequences of a contract for deed cancellation upon a vendee have been ameliorated by statute. Minnesota Statutes section 559.21 has been amended several times since 1976, and provides, based on the date of the contract, for a notice which must state that the contract will terminate in a specific number of days after service of the notice if the conditions of default have not been cured. Generally, for contracts executed after July 31, 1985, the statute provides a 60-day notice period during which the vendee may reinstate the contract by meeting certain conditions.[1]
The statutory proceeding for cancelling a land contract (contract for deed) is in the nature of a statutory strict foreclosure. Mattson v. Greifendorf, 183 Minn. 580, 583, 237 N.W. 588, 589 (1931); Nolan, 150 Minn. at 443, 185 N.W. at 648. "Proceedings under section 559.21 for the cancellation of a contract for deed which is in default are in the nature of a statutory foreclosure, akin to a foreclosure under a power of sale in a mortgage." Dale v. Pushor, 246 Minn. 254, 257, 75 N.W.2d 595, 598 (1956). Furthermore, once statutory notice has been served and cancellation effected, all rights between the parties under a contract for deed are terminated. West v. Walker, 181 Minn. 169, 171, 231 N.W. 826, 827 (1930); Olson v. Northern Pacific Ry. Co., 126 Minn. 229, 230-31, 148 N.W. 67, 68 (1914). Here, the notice of cancellation was served on Butler on March 14, 1991, and all rights between the parties terminated when the notice period of 60 days expired. See Minn.Stat. § 559.21, subd. 2a.

B. The Fraudulent Transfer Act
Minnesota's Fraudulent Transfer Act (the Act) is found at Minnesota Statutes *231 sections 513.41 to 513.51.[2] The Act was first enacted as the Fraudulent Conveyance Act and later repealed and reenacted in 1987 as the current Fraudulent Transfer Act, essentially adopting the Uniform Fraudulent Transfer Act (the Uniform Act). Act of Apr. 7, 1987, ch. 19, 1982 Minn. Laws 19. In construing the Act, the object of this court is to ascertain and effectuate the intention of the legislature. Minn.Stat. § 645.16 (1994).
Where the words of a law are not explicit, the intent of the legislature may be ascertained by considering other laws upon the same or similar subjects. Id. In this case, we must ascertain the intention of the legislature with respect to a uniform act. The intention of the drafters of a uniform act becomes the legislative intent upon enactment. Layne-Minnesota Co. v. Regents of the Univ. of Minnesota, 266 Minn. 284, 290-91 n. 13, 123 N.W.2d 371, 376 n. 13 (1963). Where a provision of the uniform state law is ambiguous, resort may be had to the notes of the drafters. Id.; see also Record v. Metropolitan Transit Comm'n, 284 N.W.2d 542 (1979) (considering the comments to the Uniform Motor Vehicle Accident Reparations Act in construing Minnesota's No-Fault Automobile Insurance Act). The drafters of the Uniform Act explain in the Uniform Act's prefatory note that the Uniform Act's predecessor represented a codification of the law related to the Statute of 13 Elizabeth. Unif. Fraudulent Transfer Act 7A U.L.A. 639, prefatory note at 639 (1985). The Statute of 13 Elizabeth, which dates back to 1570, and its descendants, which exist in every American jurisdiction today, invalidate "`covinous and fraudulent' transfers designed to `delay, hinder, or defraud creditors and others.'" BFP v. Resolution Trust Corp., 511 U.S. 531, ___, 114 S.Ct. 1757, 1763, 128 L.Ed.2d 556 (1994). Since the intent to hinder, delay, or defraud creditors is seldom susceptible of direct proof, courts have relied on "badges of fraud." 7A U.L.A. 639, prefatory note. The fact that a transfer is made for less than adequate consideration constitutes one of those badges of fraud.
Minnesota's Fraudulent Transfer Act, like the Uniform Act, provides for two scenarios under which a transfer made without adequate consideration may be fraudulent: one which is characterized by actual intent to hinder, delay or defraud, and one which is constructively fraudulent.[3] A transfer made without receiving a "reasonably equivalent value" in exchange for the transfer or obligation is constructively fraudulent under one of these conditions: (1) the debtor was engaged in or about to engage in a transaction for which he or she was left by the transfer with unreasonably small assets in relation to the transaction contemplated, or (2) the debtor intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay. See Minn.Stat. § 513.44.
A threshold question often raised in cases involving the Act, as in this case, is whether a particular event qualifies as a "transfer" within the purview of the Act. "`Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, *232 of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Minn.Stat. § 513.41(12).
In Minnesota, as elsewhere, the transfer of property pursuant to a regularly conducted, noncollusive mortgage foreclosure sale satisfies the requirement of reasonably equivalent value. Minn.Stat. § 513.43(b). The prefatory note to the Uniform Act makes a distinction between the transfer of an unencumbered property and the transfer of property which served as security for a debt. The note explains the reason why a creditor may not attack the transfer of a security interest such as a mortgage. "The premise of the new Act is that the value of the interest transferred for security is measured by and thus corresponds exactly to the debt secured." Unif. Fraudulent Transfer Act, 7A U.L.A. 639, 641, prefatory note. Section 513.43(b) indicates that "reasonably equivalent value" specifically includes the results of a regularly conducted, noncollusive mortgage foreclosure sale:
(b) For the purposes of sections 513.44(a)(2) and 513.45, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.
The purpose or intent of the Fraudulent Transfer Act is to:
prevent debtors from putting property which is available for the payment of their debts beyond the reach of their creditors. If the property transferred is not subject to the claims of creditors, the rules as to fraudulent conveyances do not apply. A transfer of property to the true owner by one who has the bare legal title is not fraudulent as to the latter's creditors.
Kummet v. Thielen, 210 Minn. 302, 306, 298 N.W. 245, 247 (1941).

C. BFP v. Resolution Trust Corp and its progeny
The definition of "reasonably equivalent value" as it appears in the U.S. Bankruptcy Code was addressed by the United States Supreme Court in BFP, 511 U.S. 531, 114 S.Ct. 1757. In a five-four decision, the Court held that "reasonably equivalent value" as required by section 548 of the U.S. Bankruptcy Code 11 U.S.C. § 548[4] for foreclosed property is the price in fact received at a noncollusive real estate mortgage foreclosure sale, so long as all the requirements of the state's foreclosure law have been complied with. Id. at ___, 114 S.Ct. at 1765. In BFP, the property was sold at a foreclosure sale for $433,000, but had a fair market value of $725,000. Id. at ___, 114 S.Ct. at 1759. The Court characterized the issue in this manner: whether the amount of debt satisfied at the foreclosure sale is "reasonably equivalent to the worth of the real estate conveyed." Id. at ___, 114 S.Ct. at 1760. In holding that reasonably equivalent value is equal to the price received at a noncollusive foreclosure sale, the Court rejected the Durrett 70% rule,[5] and stated that property that *233 must be sold within the strictures of a mortgage foreclosure is "simply worth less." Id. at ___, 114 S.Ct. at 1762. The Court examined the history of fraudulent transfer law, and noted the "[f]raudulent transfer law and foreclosure law enjoyed over 400 years of peaceful coexistence in Anglo-American jurisprudence." Id. at ___, 114 S.Ct. at 1764. The Court also observed that the section of the bankruptcy code which requires "reasonably equivalent value" in exchange for a transfer seems deliberately to avoid the obvious term "fair market value." Id. at ___, 114 S.Ct. at 1761. The Court reasoned that:
the fact that a piece of property is legally subject to forced sale, like any other fact bearing upon the property's use or alienability, necessarily affects its worth. Unlike most other legal restrictions, however, foreclosure has the effect of completely redefining the market in which the property is offered for sale; normal free-market rules of exchange are replaced by the far more restrictive rules governing forced sales. Given this altered reality, and the concomitant inutility of the normal tool for determining what property is worth (fair market value), the only legitimate evidence of the property's value at the time it is sold is the foreclosure sale price itself.
Id. at ___, 114 S.Ct. at 1767. The Court held that the reasonably equivalent value for foreclosed real property is the price received at a foreclosure sale conducted in compliance with the state's foreclosure law. Id. at ___, 114 S.Ct. at 1765. The Court specifically limited its holding to mortgage foreclosures of real property, and noted that application to tax foreclosures or other foreclosures could be different. Id. at ___ n. 3, 114 S.Ct. at 1761 n. 3.
An Oregon bankruptcy court has applied the reasoning of BFP in the context of a land sale contract, or contract for deed. Vermillion v. Scarbrough (In re Vermillion), 176 B.R. 563 (Bankr.D.Or.1994). Oregon law provides that one of a vendor's remedies in default is a "forfeiture." In a forfeiture procedure, the vendor declares the contract terminated and retains the vendee's prior payments as liquidated damages. Id. at 567. As in a Minnesota cancellation procedure, an Oregon vendor seeking forfeiture must comply with strict statutory notice requirements. Id. The Oregon bankruptcy court applied BFP to land sale contracts, holding that "[a]bsent a debt so small as to shock the conscience, cancellation of the remaining debt on an Oregon land sale contract through a forfeiture procedure regularly conducted pursuant to state law is `reasonably equivalent value' for the debtor's interest in the property within the meaning of § 548(a)(2)(A)." The Oregon court analyzed the BFP holding and opined that even though the BFP Court had limited its holding to mortgage foreclosures, "the analysis upon which the Court rests its holding has equal relevance within the context of forfeitures of Oregon land sale contracts." Id. at 568. In applying BFP to land contract forfeitures, the court first observed that there is widespread use of land sale contracts in Oregon, and that the use of this method of financing is in Oregon's basic interest. Id. at 569. The court next noted that an interest in property that is the subject of a forfeiture action is also, as in a mortgage foreclosure sale, worth less than "fair market value." Id. Further, the court stated that its "holding has particular cogency when applied in those states, such as Oregon, whose legislatures and courts have taken steps to assure that a proper balance be struck between the rights of the vendor and vendee under land sale contracts." Id.
The Oregon court further noted that a mortgagor has the three procedural protections of notice, opportunity to cure, and the requirement of strict adherence to statutory requirements under mortgage and deed of trust foreclosure proceedings. The same protections apply to contract for deed vendees. Id. at 569-70. During the cure period, the vendee in default is free to sell his or her interest in the property. Id. The court concluded that if the forfeiture procedure is regularly conducted, the reasoning of BFP is valid in the context of land sale contracts, despite the absence of a mandated sale of the property. Id.
A Pennsylvania bankruptcy court applied the reasoning of BFP and In re Vermillion to tax foreclosure sales and determined that *234 regularly conducted tax foreclosure sales conclusively meet the reasonably equivalent value standard. Lord v. Neumann (In re Lord), 179 B.R. 429 (Bankr.E.D.Pa.1995). See also In re T.F. Stone Co., 72 F.3d 466, 471 (5th Cir.1995) (holding tax foreclosure sale satisfied "fair equivalent value" requirement pursuant to BFP analysis, and observing that "the essential state interest in ensuring `security of the titles to real estate' is equally salient in both mortgage foreclosure sales and tax sales.").

II.
We now turn to the arguments of the parties in this case. The vendors, who are the appellants, argue that the Fraudulent Transfer Act does not apply to regularly conducted, noncollusive statutory cancellations of contracts for deed for two reasons: (1) under Minnesota contract for deed law, a cancellation is not a "transfer" as contemplated within the Fraudulent Transfer Act; and (2) if a contract for deed cancellation is a transfer, compliance with the statutory procedures in Minn.Stat. § 559.21 presumptively provides the "reasonably equivalent value" contemplated in the Fraudulent Transfer Act.

A. Transfer
The vendors assert that the cancellation of a contract for deed is not a "transfer" under the Act because the cancellation is merely a "reunification" of the equitable and legal title to the property. The vendors cite Kummet v. Thielen, 210 Minn. 302, 298 N.W. 245 (1941), for the rule that a transfer of the legal title to the beneficial owner is not a fraudulent conveyance as to the transferor's creditors, claiming that cancellation of a contract for deed is not a foreclosure on a security interest, but a "reunification of title." The trustee counters by examining the definition of "transfer" within the Act, and focusing on the transfer as "every mode * * * of disposing of or parting with an asset or an interest in an asset." The trustee focuses on "disposing of or parting with" as constituting a "transfer." The trustee believes that the definition of "transfer" clearly encompasses a situation where a vendee "loses" its equitable interest by a vendor's cancellation of a contract for deed.
Quoting the definition of "transfer" within the Bankruptcy Act, which definition is substantially similar to the definition in Minnesota's Fraudulent Transfer Act, the Fifth Circuit Court of Appeals stated that "[t]he comprehensive character of this definition leads us to conclude that the transfer of title to the real property of the debtor * * * constitutes a `transfer' by debtor in possession within the purview of [the Act]." Durrett v. Washington Nat'l Ins. Co., 621 F.2d 201, 203-04 (5th Cir.1980). We agree that the definition's statement that "every mode" of disposing of or parting with an asset is comprehensive and includes the statutory cancellation of a contract for deed.

B. Reasonably equivalent value
The trustee asserts that the cancellation of the contract for deed is avoidable as fraudulent within the Act because the Debtor, Butler, did not receive "reasonably equivalent value" in exchange for the transfer. The Act provides an exception with respect to reasonably equivalent value  if the debtor's interest in property is transferred via a regularly conducted, noncollusive foreclosure sale on default of a mortgage, deed of trust or security agreement, the requirement of reasonably equivalent value has been satisfied. See Minn.Stat. § 513.43(b). But the Act does not similarly expressly except the cancellation of a contract for deed as conclusively providing reasonably equivalent value.
The vendors argue that when done in conformity with the statutory process, the cancellation of a contract for deed is so similar to a mortgage foreclosure that the statutory exception for mortgage foreclosures should apply to regularly conducted, noncollusive statutory cancellations of contracts for deed. The vendors note that the Fraudulent Transfer Act does not specifically state that tax forfeiture sales are exempt from the "reasonably equivalent value" requirement, yet tax foreclosures have not been considered fraudulent transfers even though they yield less than "reasonably equivalent value." See, e.g., Lord v. Neumann, 179 B.R. 429 (Bankr. E.D.Pa.1995). The vendors ask us to apply *235 the reasoning of BFP to noncollusive statutory cancellation of contracts for deed and determine that the Fraudulent Transfer Act does not apply to them.
The trustee does not challenge the validity of the cancellation of the contract for deed, but rather challenges the vendors' receipt of a $1.2 million "windfall"  the difference in the amount of the loan outstanding and the amount that the trustee claims is the fair market value of the property. The trustee believes that this amounts to a fraudulent transfer primarily because other creditors are denied access to the excess value of the property over and above the amount of the debt.
The trustee argues that the language of the Fraudulent Transfer Act does not include an explicit exception from the "reasonably equivalent value" requirement for contract for deed cancellations, as it does for mortgage foreclosures, and asks the court to decline to "read words" into the statute. The trustee asserts that contract for deed cancellations are unlike mortgage foreclosures because no sale takes place in a contract cancellation. A major difference between contract cancellations and mortgage or tax foreclosure sales is the requirement of public notice and the opportunity to bid competitively for a property. There is, as the trustee points out, no sale in a contract for deed cancellation.
We agree with the Oregon bankruptcy court in In re Vermillion that, while no actual sale has taken place, the vendee is afforded a number of other procedural protections in the statutory cancellation of a contract for deed. The vendee has notice that the cancellation process has been initiated, the vendee then has the opportunity to cure the default, and the vendee may, during the notice period, seek competitive bids and sell the property. Minnesota's statute requires the vendor to adhere to strict notice requirements. While the processes for mortgage foreclosure and cancellation of contract for deed are not identical, they provide similar protections for the vendee and the mortgagee.
The trustee next maintains that creditors must be protected from the loss of value which occurs with a cancellation, and asserts that creditors have such protection in a forced sale context. The trustee cites Berge v. Sweet (In re Berge), 33 B.R. 642 (Bankr. W.D.Wis.1983), as setting aside a Wisconsin judgment of strict foreclosure primarily because the procedural protections for creditors were insufficient where there was no sale. While the court did note in In re Berge that the interest of the creditors was not protected, the case was actually a straight-forward application of the Durrett 70% rule, setting aside a transfer because it yielded less than 70% of the property's "fair market value." Id. at 649-50. The Durrett reasoning has been explicitly rejected by the Supreme Court in BFP. 511 U.S. at ___, 114 S.Ct. at 1764. We see no reason why the creditors should be afforded greater protection than the vendee.
Minnesota's legislature has given due regard to the rights of both vendors and vendees in upholding the utility of contracts for deed and in enacting statutes governing contracts for deed and their cancellation. Moreover, a vendee may undertake an action in unjust enrichment if there has been wrongful conduct on the part of the vendor; the vendee has an opportunity to sell the property prior to cancellation to protect his interest; and the vendee may attack any irregularity in the cancellation process. Minnesota's statutory cancellation procedure provides the vendee the protections of notice, opportunity to cure, and the condition that the vendor strictly adhere to statutory requirements. As long as these statutory requirements are met, notwithstanding the absence of a public sale as required in a mortgage foreclosure, a regularly conducted, noncollusive cancellation of a contract for deed meets the "reasonably equivalent value" standard of the Fraudulent Transfer Act. We therefore conclude that the Minnesota Fraudulent Transfer Act, Minn. Stat. §§ 513.41-.51, does not apply to regularly conducted, noncollusive statutory cancellations of contracts for deed pursuant to Minn.Stat. § 559.21.
The certified question is answered in the negative.
NOTES
[1] Minnesota Statutes section 559.21 provides:

Subd. 2a. Termination notice for contract executed after July 31, 1985. If a default occurs in the conditions of a contract for the conveyance of real estate or an interest in real estate executed on or after August 1, 1985, that gives the seller a right to terminate it, the seller may terminate the contract by serving upon the purchaser or the purchaser's personal representatives or assigns, within or outside of the state, a notice specifying the conditions in which default has been made. The notice must state that the contract will terminate 60 days, or a shorter period allowed in subdivision 4, after the service of the notice, unless prior to the termination date the purchaser:
(1) complies with the conditions in default;
(2) makes all payments due and owing to the seller under the contract through the date that payment is made;
(3) pays the costs of service of the notice, including the reasonable costs of service by sheriff, public officer, or private process server; except payment of costs of service is not required unless the seller notifies the purchaser of the actual costs of service by certified mail to the purchaser's last known address at least ten days prior to the date of termination;
(4) except for earnest money contracts, purchase agreements, and exercised options, pays two percent of any amount in default at the time of service, not including the final balloon payment, any taxes, assessments, mortgages, or prior contracts that are assumed by the purchaser; and
(5) pays an amount to apply on attorneys' fees actually expended or incurred, of $125 if the amount in default is less than $750, and of $250 if the amount in default is $750 or more; except no amount for attorneys' fees is required to be paid unless some part of the conditions of default has existed for at least 30 days prior to the date of service of the notice.
[2] 11 U.S.C. § 548 (1994) is the analogous provision in the Federal Bankruptcy Code. At section 548(a), the subject transfer must occur within one year of the filing of the petition in bankruptcy. Here, the cancellation occurred over two years prior to the filing of the petition. Accordingly, the trustee seeks to set aside this cancellation of contract for deed under Minnesota's Fraudulent Transfer Act, which has no one-year limitation.
[3] Section 513.44 of the Fraudulent Transfer Act describes which transfers are fraudulent:

513.44. Transfers fraudulent as to present and future creditors.
(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.
Minn.Stat. § 513.44 (1994) (emphasis added).
[4] Title 11 U.S.C. § 548 provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily 
(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.
[5] See Durrett v. Washington Nat'l Ins. Co., 621 F.2d 201 (5th Cir.1980). The Fifth Circuit Court of Appeals set aside a sale conducted by a trustee in the foreclosure of a deed of trust, holding that the sale proceeds were not "fair equivalent" where the property was sold for 57.7% of its market value. Id. at 203-04. The court suggested that a transfer for less than 70% of market value might be subject to avoidance on this basis. Id. at 203. This became known as the Durrett 70% rule.