# United States Bankruptcy Appellate Panel
**FOR THE EIGHTH CIRCUIT**

————————

Nos. 98-6085/6086/6087MN

————————

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Wintz Companies, | * | |
| | * | |
| Debtor. | * | |
| | * | |
| Charles W. Ries, | * | |
| | * | |
| Plaintiff-Appellee, | * | Appeal from the United States |
| | * | Bankruptcy Court for the |
| v. | * | District of Minnesota |
| | * | |
| Wintz Properties, Inc., | * | |
| George L. Wintz, | * | |
| Spindrift, Inc., | * | |
| Julianne Lenertz, | * | |
| | * | |
| Defendants-Appellants. | * | |

————————

Submitted: February 3, 1999
Filed: March 17, 1999

————————

Before KOGER, Chief Judge, WILLIAM A. HILL and SCHERMER, Bankruptcy
Judges.

————————

WILLIAM A. HILL, Bankruptcy Judge.


This matter is comprised of three consolidated appeals. Defendants-Appellants Wintz

Properties, Inc. ("Wintz Properties"); George Wintz ("Wintz"); and Spindrift, Inc. ("Spindrift") and Julianne Lenertz ("Lenertz"), appeal from the order of the bankruptcy court granting summary judgment in favor of Charles W. Ries, the Chapter 7 Trustee ("Trustee") for Debtor Wintz Companies ("Debtor"), in an adversary proceeding which the Trustee commenced to avoid five prepetition conveyances of real property as fraudulent transfers, as well as to recover for breach of contract. We reverse and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND
### 1.  Uncontested Facts

In 1995, Wintz owned numerous companies, including the Wintz Properties and the Debtor, for which he was the sole shareholder, officer, and director. Both companies operated out of Roseville, Minnesota. Wintz Properties was engaged in the property management of commercial real estate. The Debtor operated as a trucking concern.

Prior to 1996, the Debtor was comprised of five operating divisions and owned interests in the three parcels of real property which are at the heart of these appeals. The three land interests consisted of a fee interest in a warehouse located at 2500 Walnut Street, Roseville, Minnesota ("Walnut Property"); a fee interest in both a warehouse and a nine-hole golf course located at 13500 South Robert Trail, Rosemount, Minnesota ("Rosemount Property"); and a leasehold interest in a truck terminal located at 2323 Terminal Road, Roseville, Minnesota ("Terminal Road Property"),[1] which served as the Debtor's primary place of business.

From 1993 through 1995, Wintz and his companies borrowed more than $11 million from Leo Wolk and Stanley Kagin ("Wolk and Kagin") in a series of loan transactions. Only one of the loans was made directly to the Debtor, that being in the amount of $1,105,000.00.

---

[1]The Terminal Road Property is divided into two parcels, the first of which consists of approximately 28.48 acres and is abstract property, and the second of which consists of approximately 0.67 acres and is Torrens property.

The Debtor did, however, pledge some, if not all, of its assets as collateral for four loans aggregating more than $5,600,000.00 which Wolk and Kagin made to Wintz individually between 1994 and 1995. This collateral included the Walnut and Rosemount Properties.[2]

On August 1, 1995, the Internal Revenue Service issued and filed federal tax liens in the amount of $3,369,370.82 against, inter alia, the Debtor, Wintz Properties, and Wintz himself as alter egos of two other Wintz-related entities, Wintz Parcel Drivers, Inc. ("Parcel Drivers") and Wintz Freightways, Inc.("Freightways"). As the tax liens were filed with the Minnesota Secretary of State and also with Hennepin, Dakota, and Ramsey Counties, the Debtor's interests in the Terminal Road, Walnut, and Rosemount Properties became subject to IRS collection efforts at that time. Subsequently, on August 25, 1995, the IRS entered into an Installment Agreement with the parties, as well as with several other Wintz companies, for the payment of Parcel Drivers' and Freightways' outstanding tax liabilities. Neither the Debtor nor Wintz Properties contested this process.

Thereafter, between September 5, 1995 and January 1, 1996, the Debtor divested itself of its five corporate divisions and of its interests in the three parcels of real property. The divisions were sold to companies variously owned by Wintz's children and their relations. The real estate interests were conveyed to Wintz Properties and subsequently, in one instance, from Wintz Properties to Spindrift,[3] a company wholly owned by Lenertz, in the following series of transactions:

1. On December 1, 1995, the Debtor leased the Walnut Property to Wintz Properties pursuant to a Lease Agreement;

2. On December 1, 1995, the Debtor leased the Rosemount Property to Wintz

---

[2]It is unclear from the record whether the Debtor's interest in the Terminal Road Property was also pledged as collateral for the aggregate debt.

[3]Spindrift is a Minnesota corporation which incorporated in December 1997 at the same time the transfer from Wintz Properties occurred. Its primary place of business is located at 6 Merilane, Edina, Minnesota, the residential address of Lenertz.

Properties pursuant to a Lease Agreement;

3.  On December 9, 1997, Wintz Properties sold its leasehold interest in the Rosemount Property to Spindrift pursuant to a Purchase Agreement;

4.  On December 31, 1995, the Debtor assigned its leasehold interest in the Terminal Road Property to Wintz Properties pursuant to a Purchase Agreement; and

5.  On January 1, 1996, the Debtor subleased the Terminal Road Property to Wintz Properties pursuant to a Sublease Agreement.

A history of each of the aforementioned properties and conveyances is examined more closely below:

## Walnut Property

On the petition date, the Debtor was the fee owner of the Walnut Property, which it purchased from Terminal Three Partnership ("Terminal Three") for $1,650,000.00 under a Contract for Deed dated October 31, 1990, and under which it was obligated to make monthly installment payments of $22,728.75. On or about August 28, 1998, the sum of $902,126.00 remained outstanding under this purchase agreement.

The Walnut Property was also subject to a mortgage and an Assignment of Rents securing the obligations of Wintz to Wolk and Kagin in the original principal amount of $5,600,000.00.[4] Further, it remained subject to the IRS tax liens.[5]

---

[4]At an August 28, 1998 hearing before the bankruptcy court, the Trustee represented that Wolk and Kagin had mortgages of record against the property and asserted that they were owed approximately $2,800,000.00 thereon.

[5]At the same hearing, the Trustee also asserted in this regard that:

> [T]here are IRS liens against the property, which exceed I guess several million dollars, although the IRS claim is at this point $286,000.00. It's my understanding that the balance of those liens anyway that were filed have been satisfied. But the IRS undoubtedly has a lien for approximately that

4

On December 1, 1995, the Debtor leased the Walnut Property to Wintz Properties for a period of twelve months for the sum of $384,000.00, payable in equal monthly installments of $32,000.00 ("Walnut Property Lease Agreement"). The Walnut Property Lease Agreement requires that Wintz Properties obtain the prior written consent of the Debtor before assigning or mortgaging its leasehold interest, but allows Wintz Properties to "sublet or lease the leased premises, in whole or in part, without the consent of [the Debtor]."

Pursuant to a First Addendum to the Lease Agreement dated January 2, 1996, the parties extended the lease term through December 31, 2006, providing for monthly installment payments of $32,000.00 through December 31, 1996, and $45,000.00 thereafter. Additionally, the First Addendum contains the following offset provision:

> Lessor agrees that the monthly rental due from Lessee may be offset by an amount equal to monthly payments made by Lessee to the mortgagee of the Leased Premises and/or payments made by Lessee in satisfaction of assessed taxes against the Leased Premises or any other payments related to the Leased Premises made by Lessee on behalf of Lessor.

("Walnut Property Offset Provision").

On December 11, 1995, Wintz Properties subleased the Walnut Property to Dedicated Logistics, Inc. ("DLI"), a company owned by Wintz's son, Tom Wintz, for a period of twelve months at a rate of $35,000.00 per month. After the expiration of the sublease, DLI remained on the premises as a month-to-month tenant for an undisclosed period of time.

Rosemount Property

*Debtor and Wintz Properties*

On the petition date, the Debtor was the fee owner of the Rosemount Property, subject to a mortgage and Assignment of Rents in favor of Commercial State Bank (now Firstar Bank of Minnesota, N.A.) ("Firstar Bank"), securing an original principal amount of $1,700,000.00; and a mortgage and Assignment of Rents in favor or Liberty State Bank

---

much against the proceeds.

("Liberty Bank"), securing an original principal amount of $1,000,000.00. Under the respective mortgage agreements, the Debtor was obligated to make monthly payments of $24,500.00 to Firstar Bank and $15,905.75 to Liberty Bank.

Additionally, the Rosemount Property was subject to a mortgage and an Assignment of Rents securing the obligations of Wintz to Wolk and Kagin in the principal amount of $5,600,000.00.[6]  It was also subject to the IRS tax liens.[7]

In a written agreement dated December 1, 1995, the Debtor leased the Rosemount Property to Wintz Properties for a period of twelve months for the sum of $630,000.00, payable in equal monthly installments of $52,000.00 ("Rosemount Property Lease Agreement").  The Rosemount Property Lease Agreement requires that Wintz Properties obtain the prior written consent of the Debtor before assigning or mortgaging its leasehold interest, but allows Wintz Properties to "sublet or lease the leased premises, in whole or in part, without the consent of [the Debtor]."

Pursuant to a First Addendum to the Lease Agreement dated January 2, 1996, the parties extended the term of the lease to 132 months, commencing on January 1, 1996, and ending on December 31, 2006.  The First Addendum requires a total lease payment of $6,030,000.00, payable in monthly installments of $52,000.00 for the period of January 1, 1996 to December 31, 1996, and $45,000.00 for the period of January 1, 1997 to December 31, 2006.  It further contains the following offset provision:

> Lessor agrees that the monthly rental due from Lessee may be offset by an amount equal to monthly payments made by Lessee to the mortgagee of the Leased Premises and/or payments made by Lessee in satisfaction of

---

[6]See footnote 4.

[7]See footnote 5.  Also, the Trustee further represented at the hearing that "St. Paul Fire and Marine actually has a judgment against the [Rosemount] [P]roperty that was duly recorded."

assessed taxes against the Leased Premises or any other payments related to the Leased Premises made by Lessee on behalf of Lessor.

("Rosemount Property Offset Provision").

Subsequently, on December 11, 1995, the Debtor subleased the Rosemount warehouse building to DLI for a period of twelve months for the sum of $720,000.00, payable in monthly installments of $60,000.00. In 1997, DLI defaulted on its rent obligation to Wintz Properties. In turn, Wintz Properties defaulted on its lease obligations to the Debtor. The Debtor then defaulted under the terms of its Note and Mortgage with Firstar Bank. Thereafter, Firstar Bank obtained relief from stay against, and began enforcing its Assignment of Rents as to, the Rosemount Property.

*Spindrift*

On December 9, 1997, Wintz Properties sold its leasehold interest in the Rosemount Property to Spindrift for the sum of $545,000.00, payable in monthly installments of $5,000.00 through December 1, 2006 ("Rosemount Property Purchase Agreement"). On February 1, 1998, the parties modified the purchase agreement to provide for interest at the rate of 8.5 percent on the principal amount, thereby increasing Spindrift's monthly payments to $7,192.99.

On December 31, 1997, Firstar Bank entered into a Forebearance Agreement with Wintz Properties, Wintz, Spindrift, and DLI to collect rents and arrearages related to the Rosemount Property ("Firstar Forebearance Agreement"). Under the terms of the Firstar Forebearance Agreement, Spindrift was directed to pay the bank rent otherwise due the Debtor in the amount of $45,000.00 per month. Further, DLI was directed to pay Firstar $22,000.00 per month for ten months beginning February 28, 1998, for arrearages, and to make payment on its rent obligations incurred after December 31, 1997 directly to Spindrift, Wintz Properties' successor and assignee.

Thereafter, DLI continued to possess the warehouse building on a month-to-month basis at a monthly rate of $60,000.00. On or about August 28, 1998, the sum of $495,893.00

7

remained outstanding on its mortgage to Firstar Bank, and the sum of $1,153,379.00 remained outstanding on its mortgage to Liberty Bank.

Terminal Road Property

On the petition date, the Debtor held a leasehold interest in the Terminal Road Property which it acquired by a written agreement dated June 27, 1987, from its previous tenants under their Master Lease with the property's owners. For a purchase price of $1,300,000.00, the Debtor obtained an interest in the property running to December 31, 2004. Under the terms of the acquisition, the Debtor was permitted to sublease its interest only after obtaining the prior written consent of the property's owners.

On July 11, 1991, Premier Bank made a loan of $1,300,000.00 to the Debtor, for which it took a leasehold mortgage and Assignment of Rents in the Terminal Road Property as security. Under a Replacement Promissory Note dated October 19, 1995, the Debtor became obligated to make monthly installment payments to Premier Bank, in escrow, of $40,000.00 plus interest, along with real estate taxes. Subsequently, the Terminal Road Property became encumbered by the IRS tax liens.[8]

As of December 31, 1995, the Debtor carried the Terminal Road Property on its books at a value of $1,045,582.70. On the same date, the Debtor executed a Purchase Agreement to sell its leasehold interest in the Terminal Road Property to Wintz Properties for the sum of $900,000.00, payable in two equal installments of $450,000.00 plus interest, the first of which fell due on December 15, 1995, and the second of which fell due on January 31, 1996 ("Terminal Road Property Purchase Agreement"). The "Conveyance Terms" of the Purchase Agreement provides, in pertinent part, as follows: "Upon Buyer's full performance of Buyer's obligations under this Agreement, Seller shall execute and deliver to Buyer a Quit Claim Deed and Assignment conveying title to the Property to Buyer . . . ."

---

[8]See footnote 5. Also, we note again that there is some question as to whether this property serves as collateral for the Wolk and Kagin loans, a question which does not appear to be definitively answered by an examination of the record before us.

Wintz Properties did not, however, make any payments under the purchase agreement to the Debtor. Moreover, the sale was never memorialized on the Torrens Certificate of Title, nor was a Quit Claim Deed ever executed and delivered by the Debtor to Wintz Properties.

Subsequently, on January 1, 1996, the Debtor subleased the Terminal Road Property to Wintz Properties for a term of five years, ending on December 31, 2000, for the sum of $900,000.00, payable in monthly installments of $15,000.00 ("Terminal Road Property Sublease Agreement"). In a First Addendum to the Sublease Agreement, dated March 15, 1996, the term of the lease was extended to December 31, 2004. While the amount of the installment payments remained unchanged, they became payable in the following manner: $12,560.84 directly to the owners of the property, and $2,439.16 to the Debtor.

_____

As of December 1, 1995, the Debtor's remaining tax debt to the IRS aggregated $3,751,873.73. However, in consequence of the Debtor's property sales, $2,953,216.00 was paid in satisfaction of the tax debt. Subsequently, the IRS filed a proof of claim in this case in the amount of $285,155.38.

On August 15, 1997, creditors of the Debtor filed an involuntary petition against it under Chapter 7 of the United States Bankruptcy Code. On November 18, 1997, the Debtor voluntarily converted the case to one under Chapter 11 of the Code. On December 13, 1997, the Debtor voluntarily reconverted the case to one under Chapter 7. On January 6, 1998, Charles W. Ries was elected as the Chapter 7 Trustee.

On the petition date, the Debtor was in arrears on its monthly mortgage payments to Premier Bank on the Terminal Road Property. Premier Bank then obtained relief from the automatic stay with regard to the property on October 14, 1997. Thereafter, and pursuant to its exercise of its Assignment of Rents, Premier Bank began collecting rents on the Terminal Road Property, making its lease payments, and maintaining the property. On April 24, 1998, a receiver was appointed to manage the Terminal Road Property pursuant to the Order of the

9

District Court for the County of Ramsey, State of Minnesota. The Order provides, in pertinent part, as follows:

> 3. The Receiver shall manage the Mortgaged Premises so as to prevent waste, and to the extent of available rents and other income from the Mortgaged Premises, provide for normal maintenance and perform the duties customarily performed by property managers in the Twin Cities area including, but not limited to, *entering into leases, enforcing leases and terminating leases.* The Receiver shall . . . collect the rents, profits and other payments from tenants, occupants, and other users of the Mortgaged Premises together with all other income of any kind from the Mortgaged Premises, . . . .
>
>     . . .
>
> 5. Defendant Wintz Companies and any of its affiliates, agents or employees shall cooperate with the receiver by handing over and making available to the receiver all records and accounts in their possession relating to the operation and management of the Mortgaged Premises . . . and shall immediately endorse and deliver to the Receiver any and all checks and other payments now or hereafter in its possession representing payment of rents for the Mortgaged [P]remises and other income from the Mortgaged Premises, and shall turn over to the receiver the balances in any checking, savings or other bank account maintained for the purpose of holding deposits of rent and other income received from the operation of the Property, and *shall do nothing whatsoever to interfere with the Receiver's performance of its duties.*

Premier Bank v. Wintz Cos., No. C4-96-6765 (Minn. D. Ct. April 24, 1998).


2. The Present Action


On April 17, 1998, the Trustee commenced an Adversary Proceeding against Wintz Properties, Wintz, Spindrift, and Lenertz for the recovery of fraudulent transfers, breach of contract, and damages. Specifically, the Trustee sought, inter alia, (1) a determination that the property conveyances made by the Debtor to Wintz Properties, and by Wintz Properties to Spindrift, were fraudulent transfers pursuant to Minn. Stat. §§ 513.44(a)(1) or (a)(2), and were avoidable by the Trustee pursuant to 11 U.S.C. §§ 544(b) or 550; and (2) under the theory of breach of contract, a determination that Wintz Properties defaulted under the

10

Walnut Property Lease Agreement, the Rosemount Property Lease Agreement, the Terminal Road Property Purchase Agreement, and the Terminal Road Property Sublease Agreement, along with an order terminating Wintz Property's rights under these agreements, as well as the recovery of damages from, or rents collected by, Wintz Properties. On July 22, 1998, the Trustee moved for summary judgment, filing his Memorandum in Support thereof on July 23, 1998.

On or about August 11, 1998, Spindrift and Lenertz responded to the Trustee's motion, asserting that the Rosemount Property Purchase Agreement is not subject to avoidance as a fraudulent transfer under Minnesota Statute §§ 513.44(a)(1) or (a)(2), as Spindrift and Lenertz are subsequent transferees, and took in good faith and for a reasonably equivalent value, pursuant to Minnesota Statute § 513.48. As support therefor, Spindrift and Lenertz offered the affidavit of James Grobe, as well as the uncontested testimony of Lenertz herself. They also contend, upon the same evidentiary basis, that they qualify under the bona fide purchase defense of 11 U.S.C. § 550(b)(1) so as to defeat the Trustee's action against them under 11 U.S.C. § 550(a). Wintz responded to the Trustee's Motion for Summary Judgment by an Objection filed on or about August 11, 1998, denying and countering many of the Trustee's factual assertions and joining in the arguments of Wintz Properties with respect to the Rosemount and Walnut Properties.

Wintz Properties responded on or around August 11, 1998, contesting the Trustee's assertions by arguing, and presenting evidence which purports to demonstrate, that (1) the Debtor received $1,045,582.70 from Wintz Properties under the Terminal Road Property Purchase Agreement; and that (2) the Trustee is not entitled to rent payments under the Walnut, Rosemount, and Terminal Road Property Lease or Sublease Agreements "because assignments of rent and leases in favor of the mortgagee banks are being exercised as to both the Terminal Road and Rosemount Properties, and the Trustee has not made a sufficient showing that any amount of rents [are] due on the Walnut Property, or any of the other properties."

In support of its first assertion, a Stipulation entered into in connection with the Debtor's initial acquisition of its leasehold interest in the Terminal Road Property purports

11

to allow the Debtor to sublease the premises during the term of the Master Lease without the owners' prior notice or consent. In this connection, two Wintz Company book entries dated January 30, 1996, and January 31, 1996, and carrying the explanatory captions, "Transfer Lease 2323 Terminal Road," and "Transfer lease," respectively, taken together with the Debtor's balance sheet as of March 26, 1996 for the period ending January 31, 1995, and as of March 11, 1997 for the period ending January 31, 1996, purportedly substantiate Wintz Properties' assertion that it paid $1,045,582.70 for its receipt of the Debtor's interest in the Terminal Road Property in the form of the assumption of an $800,000.00 liability to Premier Bank and a payable for the balance, in the amount of $245,582.70. Further, in his Affidavit, Jeffrey J. Stutzman, a certified public accountant retained by Wintz Properties to review business records and practices surrounding the Terminal Road, Rosemount, and Walnut Properties as they pertain to this matter, stated as follows:

> 10. My review of [the] records shows that beginning with checks dated February 6, 1996[,] Properties began paying the operating and financing expenses with respect to 2323 Terminal Road, including the making of payments to Premier Bank on the obligation of Wintz Companies. This is consistent with the transfer for consideration recorded in January 1996.
> 11. Based upon the foregoing, I conclude that on or about January 31, 1996, Wintz Companies received consideration from Properties of $1,045,582.70 in the form of assuming the obligations of Wintz Properties [sic] to Premier Bank in the amount of $800,000 and of a payable to Wintz Companies for the balance. I further conclude that Wintz Properties began to perform on its obligations by making payments to Premier Bank and by taking over responsibility for operation and management of the Terminal Road Property.

In support of its second assertion, Wintz Properties argues severally as to the Walnut, Rosemount, and Terminal Road Properties. First, and with respect to the Walnut Property, Wintz Properties asserts that the Trustee failed to give proper notice of default, and failed to provide Wintz Properties with the requisite opportunity to cure, under the Walnut Property Lease Agreement. In this connection, the Lease Agreement provides:

> 17. If [Wintz Properties] shall fail to pay to the Lessor the rent and/or other sums of money payable to the Lessor as and when due and

payable hereunder, or in case [Wintz Properties] shall fail to comply with any other material provision or condition of this Lease upon its part to be kept and performed and such nonpayment or other default shall continue for a period of sixty (60) days after written notice thereof shall be given to [Wintz Properties] by the Lessor, it shall be lawful for the Lessor to enter upon said premises, and again have, repossess and enjoy the same as if this Lease had not been made, and everything herein contained on the part of the Lessor and [Wintz Properties] to be done and performed shall cease.

Further, Wintz Properties directs attention to the date of the Trustee's notice of default, as well as its contents. The Trustee provided such notice to Wintz Properties, through its counsel James A. Rubestein, in a letter dated April 1, 1998, which states, in pertinent part, that:

> The Trustee has not received the $45,000/month rental payments from Wintz Properties relating to the Walnut Property. Wintz Properties is in default for the months of October, 1997 through March, 1998 in the total amount of $270,000.

> The Trustee also has not received the $2,439.16/month payments for 1997 and for the months of January, February, and March, 1998 under the purported sublease agreement on the Terminal Road Property.

> Finally, Wintz Properties is in arrears for the total amount of $90,000 on $45,000/month rent owed to [the Debtor] for the months of October and November, 1997 on the Rosemount Property.

> This is to inform you that the Trustee is terminating all leases with Wintz Properties effective 30 days from the date of this notice.

Second, and with respect to the Rosemount Property, Wintz Properties makes similar assertions, but with reference to the Firstar Forebearance Agreement, as follows:

> Firstar Bank sought and obtained an Order from the Bankruptcy Court modifying the automatic stay to permit it to exercise its rights pursuant to the mortgage and the assignment of rents granted by [the Debtor] on the Rosemount Property. Firstar exercised its rights and entered into a

> forbearance agreement with Properties[, which] provides for the payment and curing of defaults, if any, under the Rosemount Lease.
>
> In the [F]irst [A]ddendum to the Rosemount Property lease, the parties agreed that monthly rental due from Properties may be offset by an amount equal to monthly payments made by Properties to the mortgagee of the leased premises and/or payments made by Properties in satisfaction of assessed taxes against the leased premises or any other payments related to the leased premises made by Properties on behalf of Companies. There is no default under the payments due in the Forebearance Agreement. If there are any rights to be exercised due to a breach of the lease, they now belong to Firstar, not the Trustee.

In this connection, the Firstar Forebearance Agreement, which was effective as of December 31, 1997, and to which Wintz Properties, Firstar, Wintz, DLI, and Spindrift were party, provides as follows:

> 1. Beginning effective December 31, 1997[,] and continuing until . . . all indebtedness under the Note is paid in full, Spindrift shall pay rent otherwise due to Companies in the amount of $45,000 a month directly to [Firstar] pursuant to its Assignment of Rents.
> . . .
> 3. With respect to the unpaid rent due to Companies from Properties, it is acknowledged that [Firstar] has exercised its remedies under the Assignment of Rents. In satisfaction of these rent obligations, [DLI] shall pay $22,000 a month for ten months beginning February 28, 1998 directly to Firstar. When paid, these payments will also be credited toward the obligation of [DLI] to Properties for unpaid rent for the Premises.
> 4. Firstar agrees that all payments received by it pursuant to this Agreement for rent due on or after December 31, 1997[,] shall be applied in accordance with the Assignment of Rents and Minnesota Statutes §§ 559.17 and 576.01. It further agrees that all payments received for rent due prior to December 31, 1997 will be applied in any manner authorized by § 576.01 et seq. or the Firstar Mortgage.

Further, the First Addendum to the Rosemount Property Lease Agreement, dated January 2, 1996, provides:

14

3.        [The Debtor] agrees that the monthly rental due from [Wintz Properties] may be offset by an amount equal to monthly payments made by [Wintz Properties] to the mortgagee of the Leased Premises and/or payments made by [Wintz Properties] in satisfaction of assessed taxes against the Leased Premises or any other payments related to the Leased Premises made by [Wintz Properties] on behalf of [the Debtor].

Finally, in his Affidavit, Dean E. Davidson, Vice President of Firstar, states that as of August 10, 1998, "no party is in default of any of the payments called for in the Forebearance Agreement."

Third, and with respect to the Terminal Road Property, Wintz Properties makes the following arguments with reference to Premier Bank's having been granted relief from stay, having exercised its Assignment of Rents, and to the order of the Minnesota district court appointing a receiver:

[F]ollowing the Petition Date, Premier Bank sought relief from the automatic stay to exercise its rights and remedies pursuant to its mortgage and its assignment of rents granted by [the Debtor] on the Terminal Road Property to secure certain indebtedness. . . . After Premier Bank obtained the relief from the automatic stay, it exercised its rights pursuant to its mortgage and assignment of rents.

Following action by Premier Bank to enforce its assignment of rents, Properties instructed its tenants at the Terminal Road Property to pay all rentals directly to Premier Bank. The [T]rustee acknowledges that the rental obligation from Properties to Companies is $15,000 a month, all but $2,439.16 of which goes to the Terminal Road Property Owners. The [T]rustee also acknowledges that since the exercise by Premier Bank of its assignment of rents, the subtenants of Properties have paid approximately

$82,000.00 a month to the bank. In so doing, any default of Properties has been cured.

15

Wintz Properties then asserts that "the [T]rustee has no right to demand payment of rents because Premier has exercised its right to the assignment of rents," and that "there is a material issue of fact as to whether any monetary default now exists."

On August 28, 1998 and September 3, 1998, the bankruptcy court held hearings ("August Hearing" and "September Hearing," respectively), and ruled on, the Trustee's motion. At the August Hearing, the court indicated that it would grant the Trustee's Motion for Summary Judgment as to his request to avoid the conveyances of the Debtor's interests in the three subject parcels of real estate to Wintz Properties, on the bases of both actual and constructive fraud. At the September Hearing, the bankruptcy court indicated that it would grant the Trustee's Motion for Summary Judgment as to his request to avoid the conveyance of the Rosemount Property from Spindrift and Lenertz, and also that it would grant the motion with respect to the Trustee's claims for breach of contract.

On September 21, 1998, the bankruptcy court entered Judgment in favor of the Trustee, first, by avoiding the five conveyances as fraudulent transfers pursuant to 11 U.S.C. §§ 544(b) and 550, and Minn. Stat. § 513.44(a)(1) or (a)(2); and second, in finding that Wintz Properties "materially breached its duties under" the Walnut Property Lease Agreement, the Rosemount Property Lease Agreement, the Terminal Road Property Purchase Agreement, and the Terminal Road Property Sublease Agreement, so as to allow the Trustee to "exercise all rights granted to the Debtor under them in consequence of such breaches."

Wintz, Wintz Properties, Spindrift, and Lenertz timely appealed the Judgment of the bankruptcy court. Our discussion now follows.

## II. DISCUSSION
### 1. Standard of Review

We review the bankruptcy court's grant of summary judgment de novo. See Peter v. Wedl, 155 F.3d 992, 996 (8th Cir. 1998); Mayard v. Hopwood, 105 F.3d 1226, 1227 (8th Cir. 1997); Wade v. Midwest Acceptance Corp. (In re Wade), 219 B.R. 815, 818 (B.A.P. 8th Cir. 1998). Summary judgment is only appropriate "if the record 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting Fed. R. Civ. P. 56(c)); see Kraft v. Ingersoll-Rand Co., 136 F.3d 584, 585 (8th Cir. 1998); In re Wade, 219 B.R. at 818; see also Fed. R. Bankr. P. 7056 (making Fed. R. Civ. P. 56 applicable in adversary proceedings in bankruptcy). In making this determination, the function of the presiding court is not to weigh evidence and to make credibility determinations, or to attempt to determine the truth of the matter, but is, rather, solely "to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); see Wedl, 155 F.3d at 996; Quick v. Donaldson Co., 90 F.3d 1372, 1376-77 (8th Cir. 1996); see also Mathews v. Trilogy Communications, Inc., 143 F.3d 1160, 1163 (8th Cir. 1998) ("When evaluating a motion for summary judgment, we must . . . refrain from assessing credibility."). Indeed, under the proper analysis, "the [c]ourt views the facts in a light most favorable to the nonmoving party and allows that party the benefit of all reasonable inferences to be drawn from that evidence.'" Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8th Cir. 1997), cert. denied sub nom. Hinkel v. Hinkel, --- U.S. ---, 118 S. Ct. 693, 139 L.Ed.2d 638 (1998); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Dulany, 132 F.3d at 1237; Kunkel v. Sprague Nat'l Bank, 128 F.3d 636, 640 (8th Cir. 1997).

Upon a motion for summary judgment, the initial burden of proof is allocated to the movant in the form of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 3553-54, 91 L.Ed.2d 265 (1986); see Matsushita, at 586, 106 S. Ct. at 1355; Hinkel, 121 F.3d at 366; Nelson v. Kingsley (In re Kingsley), 208 B.R. 918, 920 (B.A.P. 8th Cir. 1997). Once met, the burden then shifts to the nonmoving party "to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, at 324, 106

S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)); see Matsushita, at 587, 106 S. Ct. at 1356; Tenbarge v. Ames Taping Tool Sys., Inc., 128 F.3d 656, 658 (8th Cir. 1997); In re Kingsley, 208 B.R. at 920.

In this respect, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; [it] must show there is sufficient evidence to support a jury verdict in [its] favor." Chism v. W.R. Grace & Co., 158 F.3d 988, 990 (8th Cir. 1998) (quoting Matsushita, at 586, 106 S. Ct. at 1356) (internal quotation marks omitted); see Anderson, at 249, 106 S. Ct. at 2510.  "[T]he mere existence of a scintilla of evidence in favor of the nonmoving party's position is insufficient to create a genuine issue of material fact." Rabushka ex rel. United States  v. Crane Co., 122 F.3d 559, 562 (8th Cir. 1997) (internal quotation marks omitted, quoting In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1492 (8th Cir. 1997)), cert. denied, --- U.S. ----, 118 S. Ct. 1336, 140 L.Ed.2d 498 (1998); see Anderson, at 252, 106 S. Ct. at 2512;  Devine v. Stone, Leyton & Gershman, P.C., 100 F.3d 78, 81-82 (8th Cir. 1996), cert. denied, --- U.S. ----, 117 S. Ct. 1694, 137 L.Ed.2d 821 (1997).

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, at 322, 106 S. Ct. at 2552; see Chism, 158 F.3d at 990-91;  Dulany, 132 F.3d at 1237;  Rabushka, 122 F.3d at 562 (internal quotation marks omitted, quoting Temporomandibular Joint, 113 F.3d at 1492).  "We look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" Dulany, supra (quoting Anderson, at 248, 106 S.Ct. at 2552);  see South Dakota Mining Assoc., Inc. v. Lawrence County, 155 F.3d 1005, 1009 (8th Cir. 1998) (quoting same);  Dodd v. Runyon, 114 F.3d 726, 729 (8th Cir. 1997).

2.  Transfer Avoidance

*Trustee's Standing under § 544(b)*

We begin our analysis with an evaluation of the Trustee's standing to bring his claims of fraudulent transfers. Standing is a qualifying hurdle which must be addressed by the court sua sponte when it emerges from the record on appeal. See Pashaian v. Eccleston Properties, Ltd., 88 F.3d 77, 82 (2d Cir. 1996); Community First Bank v. National Credit Union Admin., 41 F.3d 1050, 1051 (6th Cir. 1994); Miener v. Missouri, 673 F.2d 969, 974 (8th Cir.), cert. denied, 459 U.S. 909, 103 S. Ct. 215, 74 L.Ed.2d 171 (1982); see, e.g., Van Leeuwen v. United States, 868 F.2d 300, 301 (8th Cir.) (affirming district court's sua sponte dismissal of plaintiffs' complaint on grounds that, among other things, they lacked standing), cert. denied, 493 U.S. 838, 110 S. Ct. 120, 107 L.Ed.2d 81 (1989). "If there is a dispute in the relevant facts, the issue of an appellant's standing should be remanded to the [trial court]." Lopez v. Behles (In re American Ready Mix, Inc.), 14 F.3d 1497, 1500 (10th Cir.), cert. denied, 513 U.S. 818, 115 S. Ct. 77, 130 L.Ed.2d 31 (1994); see GMAC v. Dykes (In re Dykes), 10 F.3d 184, 187 (3d Cir. 1993). Where, however, there is no dispute in the relevant facts, the appellate court may proceed to decide the issue. See Marlow v. Rollins Cotton Co. (In re Julien Co.), 146 F.3d 420, 423 (6th Cir. 1998); In re American Ready Mix, Inc., 14 F.3d at 1500.

The Trustee invoked § 544(b) as a conduit for bringing his state-law-based fraudulent conveyance actions in bankruptcy. Section 544(b) permits a trustee to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title . . . ." 11 U.S.C. § 544(b); see Lippe v. Bairnco Corp., 225 B.R. 846, 852 (S.D. N.Y. 1998), reh'g granted in part, --- B.R. ----, 1999 WL 4925 (S.D. N.Y. Jan. 5, 1999); Girard v. Michener (In re Michener), 217 B.R. 263, 270 (Bankr. D. Minn. 1998). In the instant matter, the pertinent "applicable law" is Minnesota's enactment of the Uniform Fraudulent Transfer Act, Minn. Stat. §§ 513.41-513.51 ("MFTA").

However, in order to avail himself of the benefits conferred by § 544(b), and concomitantly, of the MFTA, the Trustee "must first show that there is an actual unsecured creditor holding an allowable unsecured claim . . . who, under [state] law, could avoid the transfers in question." Sender v. Simon, 84 F.3d 1299, 1304 (10th Cir. 1996) (quoting Dicello v. Jenkins (In re Int'l Loan Network, Inc.), 160 B.R. 1, 18 (Bankr. D. D.C. 1993))

19

(alteration in the original and internal quotation marks omitted);  see Lippe, 225 B.R. at 852; Lassman v. Goldstein (In re Goldstein), 194 B.R. 1, 2-3 (Bankr. D. Mass. 1996);  Harris v. National Inv. & Fin. Co. (In re Akin), 64 B.R. 510, 513 (Bankr. W.D. Ky. 1986);  5 Collier on Bankruptcy ¶¶ 544.09- .09[1], at 544-16 to -18 (Lawrence P. King ed., 15th ed. rev. 1998).  Thus far, the Trustee has not only failed to identify such a creditor, but has failed even to allege that such a creditor exists, as he is required to do in order to meet this threshold burden.  Accordingly, the Trustee presently lacks standing to pursue his fraudulent transfer actions.

However, we note that even were we to take up the Trustee's fraudulent transfer claims, assuming arguendo that he satisfied the standing requirements imposed pursuant to § 544(b), they would fail nonetheless for he has failed to establish an essential, predicate element under the MFTA.

*Fraudulent Conveyances*

In 1987, Minnesota adopted the MFTA, which "provides remedies to creditors who are aggrieved by fraudulent transfers made by a debtor." Metropolitan Steel Fabricators, Inc. v. Michalski (In re Metropolitan Steel Fabricators, Inc.), 191 B.R. 150, 153 (Bankr. D. Minn. 1996).  "The purpose of the Fraudulent Transfer Act is to:  'prevent debtors from putting property which is available for the payment of their debts beyond the reach of their creditors.'" Shields v. Goldetsky (In re Butler), 552 N.W.2d 226, 231 (Minn. 1996) (quoting Kummet v. Thielen, 298 N.W. 245, 247 (Minn. 1941)).  Towards this end, Minn. Stat. § 513.44(a) contains two alternate prongs under either of which a fraudulent transfer may be established, the "actual fraud" provision found in subpart (1), and the "constructive fraud" provision found in subpart (2), which, together, provide as follows:

> (a)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>> (1)  with actual intent to hinder,  delay, or defraud any creditor of the debtor;  or

20

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

   (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

   (ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Minn. Stat. § 513.44(a). Ordinarily, the burden of proof is upon the "aggrieved creditor" to establish that a conveyance is fraudulent. Snyder Elec. Co. v. Fleming, 305 N.W.2d 863, 867 (Minn. 1981); see New Horizon Enters., Inc. v. Contemporary Closet Design, Inc., 570 N.W.2d 12, 14 (Minn. Ct. App. 1997).

A threshold determination to be made under the MFTA--and one raised by the appellants to challenge the propriety of the bankruptcy court 's grant of summary judgment in favor of the Trustee under both prongs of § 513.44(a)--is whether "transfers" occurred at all. This inquiry is, in turn, dependent upon another, that is, whether any of the items purportedly "transferred" constitute "assets."

The term "transfer," for purposes of the MFTA, "means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with *an asset or an interest in an asset*, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Minn. Stat. § 513.41(12) (emphasis added); see In re Butler, 552 N.W.2d at 231-32. There is no dispute but that the property in question on this appeal was "disposed of" or "parted with" in the instant matter. The question remains, however, whether any of this property constitutes an "asset," so that its disposition might then qualify as a "transfer." Where the term "asset" does not apply to property which has been conveyed, neither then does the MFTA. See Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp., 959 P.2d 1052, 1060 (Wa. 1998) (interpreting identical definitions of "transfer" and "asset" under applicable statute); Rich v. Rich, 405 S.E.2d 858, 861 (W.Va. 1991) (same); Kellstrom Bros. Painting v. Carriage Works, Inc., 844 P.2d 221, 222 (Or. Ct. App. 1992) (same), rev. denied, 856 P.2d 317 (Or. 1993).

21

The term "asset," while generally defined as being "property of the debtor," excludes any of the following: "(i) property to the extent it is encumbered by a valid lien; (ii) property to the extent it is generally exempt under nonbankruptcy law; or (iii) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant." Id. at 513.41(2).[9] In turn, the term "valid lien," as it applies to the foregoing definition, "means a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." Minn. Stat. § 513.41(13). The statute also ascribes a particular meaning to the term "lien," which it defines as being, "a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common-law lien, or a statutory lien." Minn. Stat. § 513.41(8).

Appellants argue that the conveyed properties were so encumbered by valid liens that they did not constitute "assets." Their position, insofar as it relates to the argument that summary judgment was improperly granted in this instance, is supported by the statements of both the Trustee and the bankruptcy court.

In this first respect, the Trustee does not dispute the fact that the Walnut, Rosemount, and Terminal Road Properties are encumbered by IRS tax liens and various mortgages. Additionally, he acknowledges that the properties are, or may be, subject to mortgage interests held by Wolk and Kagin. He further states that the Rosemount Property is subject to a judgment lien held by St. Paul Fire and Marine. The present status and amount of each of these encumbrances is unknown or undisclosed.

Thus it may be that each of these interests would qualify as a "lien" under the MFTA. Indeed, it may even be that they all constitute "valid liens," as that term is defined under the MFTA. If so, they would, accordingly, factor into the threshold determination of whether

_____

[9]The terms "property," "creditor," and "claim" are similarly defined under MFTA as being, respectively, "anything that may be subject of ownership," Minn. Stat. § 513.41(10); "a person who has a claim," id. at 513.41(4); and "liability on a claim," id. at 513.41(5).

the property interests at issue on this appeal constitute "assets," the definition of which is similarly controlled by the MFTA.

Secondly, the bankruptcy court's ruminations underscore this need for further information, and support the Appellants' argument, on this point. In this connection, the court made the following statements at the August Hearing:

> I have concluded . . . there was indeed, an asset that was transferred here, notwithstanding *the fact that we don't have proof of equity and the sort of very simple bankruptcy consideration of net value of an asset remaining above and beyond encumbrances*. What took place here was a transfer of the actual or incipient income stream from these properties. These properties had substantial value in the form of facilities that were all ready to be rented . . . . As the Trustee has proved up, those rents had and have very substantial value.

(Emphasis added).[10]

From the bankruptcy court's statements, it is apparent that the court substituted its own definition for the term "asset"--apparently believing it to be, under the circumstances, "an actual or incipient income stream from [the] properties . . . . [that] had and have very substantial value"--for that of the statute, as previously detailed herein. Such an action is

---

[10]Later in the proceedings at the August Hearing, and in the context of making a determination on the subject of reasonably equivalent value, the court reiterated:

> *It's also my conclusion that one again need not get down to the more classic bankruptcy definition and the more classic bankruptcy formulation of reasonably equivalent value, taking a formal appraisal of an asset[,] considering in turn the amount of debt outstanding that's chargeable by way of valid and enforceable liens against it, looking at it in [terms of] equity* and then trying to determine what the cash consideration was in relation to the amount of equity that transferred.

(Emphasis added).

23

clearly proscribed. The statute may only be triggered by its own terms and definitions, of which this is not one.

In sum, the Trustee indicated, and the bankruptcy court acknowledged, that proof of the type necessary to make an "asset" determination under the statute was lacking at the stage of summary judgment disposition. We agree and, upon this basis and in connection with our previous discussion of relevant law on this point, reverse the bankruptcy court's grant of summary judgment avoiding the various conveyances of the Walnut, Rosemount, and Terminal Road Properties from the Debtor to Wintz Properties.

*Spindrift and Lenertz*

The issue of whether the bankruptcy court properly allowed the Trustee to avoid the conveyance of Wintz Properties' interest in the Rosemount Property to Spindrift also hinges upon the dual determinations of whether the property interest which Spindrift purchased constitutes an "asset," and was "transferred"--determinations, again, to be made in the bankruptcy court. In this connection, Section 550 provides, in pertinent part, as follows:

> (a) Except as otherwise provided in this section, *to the extent that a transfer is avoided under section 544 . . .* of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> > (2) any immediate or mediate transferee of such initial transferee.
>
> (b) The trustee may not recover under subsection (a)(2) of this section from--
> > (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> > (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a)-(b) (emphasis added).

The Trustee's recovery action under this section was dependent upon his successful avoidance of the conveyance of the Rosemount Property from the Debtor to Wintz Properties. Having concluded that the bankruptcy court erred by prematurely avoiding this predicate conveyance, the Trustee's recovery action against Spindrift under § 550 must also be denied. Thus, we reverse the bankruptcy court's grant of summary judgment avoiding the conveyance of the Rosemount Property from Wintz Properties to Spindrift.

3. Breach of Contract
*Walnut Property*

The evidence proffered by Wintz Properties presents a genuine issue for trial as to the nature and effect of the Trustee's notice of default concerning the Walnut Property. Further, and with respect to the Walnut Property Offset Provision, there remains a genuine issue for trial under the Trustee's action for breach of contract. Thus, we reverse the bankruptcy court's grant of summary judgment to the Trustee on the basis of breach of contract as to the Walnut Property.

*Terminal Road Property*

Once again, we undertake an analysis of the Trustee's standing, the issue now being whether he has standing to enforce or terminate the Terminal Road Property Sublease and Purchase Agreements. Wintz and Wintz Properties assert that he does not.

We make no finding here, but agree that on the record presented, this question gives rise to a genuine issue for trial. At the very least, the competing interests of the Trustee and Premier Bank, and/or its Receiver, in the Terminal Road Property must be further explored in this connection.

Alternatively, the issue of whether Wintz Properties is in fact in breach of contract, in light of Premier Bank's Assignment of Rents and the Order appointing a receiver, must be developed at trial. Accordingly, we reverse the bankruptcy court's grant of summary judgment to the Trustee on breach of contract as to the Terminal Road Property.

25

The same issues of standing and breach of contract arise with respect to the Rosemount Property, but in relation to the Firstar Forebearance Agreement and the Rosemount Property Offset Provision, respectively. For all the same reasons, we reverse the bankruptcy court's grant of summary judgment to the Trustee on the basis of breach of contract as to the Rosemount Property.

## III. CONCLUSION

Accordingly, we reverse the September 21, 1998 Judgment of the bankruptcy court granting summary judgment in favor of the Trustee and remand to the bankruptcy court for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. BANKRUPTCY APPELLATE PANEL, EIGHTH CIRCUIT.